38542. JACKSON v. THE STATE.

SMITH, Justice.

Appellant James Terrell Jackson and his uncle, Joseph Gammage, were tried before a jury and on January 20, 1982, Jackson was found guilty in Dougherty County on all counts under an indictment charging him with murder, motor vehicle theft, rape, and armed robbery. Gammage was acquitted on all four charges. Jackson received a life sentence for murder and concurrent sentences of twenty and seven years for armed robbery and motor vehicle theft. He was sentenced to twenty years for rape, to be served consecutively to the life sentence. Jackson appeals and we affirm.

Thelma Raybun owned the Bridal and Formal Wear shop on South Slappey Drive in Albany, Georgia. She was visited at work during the afternoon of Friday, August 7, 1981, by her daughter, Susan Chambers. Susan left the shop at about 3:30 p.m. and expected to see her mother again around 7 p.m. that evening for dinner.

Raybun's son, Ralph, spoke with his mother for twenty minutes on the telephone beginning at 5:15 p.m., from Augusta, Georgia, where he lived. He described her mood as "great." A second son, Robert, testified that when he telephoned the Bridal Shop at 6 p.m. no one answered.

A neighbor taking out her garbage on the alley serving the Bridal Shop observed a car the color of Raybun's traveling at high speed through the alley at approximately 6:30 p.m. The neighbor was

unable to identify the persons in the car as to sex, race, or number.

At 7:30 p.m. Susan Chambers became worried about her mother's absence and there was no response to telephone calls to the Bridal Shop. Sometime after 7:30 p.m. Susan and Clay Raybun drove to the Bridal Shop. The inside store lights were on and the back door was locked. Susan entered through the open front door and found Mrs. Raybun lying dead on the floor with her head propped against a wall of her office. Clay summoned police and medical services, who arrived at approximately 8:45 p.m.

At the time Mrs. Raybun was discovered her face was lacerated and she showed no signs of life. Blood spattered the floor, the wall, Mrs. Raybun, and a telephone and desk. Her pants were off and her body was bare from the waist down. There were between sixteen and twenty-two individual stab wounds to her body, with several thin stab wounds on both sides of her neck. Deep circular puncture wounds in her chest and abdomen showed surface handle impressions indicating that a weapon had been inserted to the hilt. Her heart and lungs were punctured by sharp instruments and her scalp was lacerated, bruised, and torn. Her head and body were bruised. The victim died as a result of stab wounds to her chest and abdomen.

Vaginal swabs were taken from the body and under analysis showed the presence of semen. Dried matter on the victim's abdomen was collected and analyzed as saliva from a person with type O blood. Jackson has type O blood and the victim had type A blood.

On the floor of the office near where the body was discovered police found empty bank bags, money envelopes, and deposit slips. The room was in general disarray with magazines and other items from a display case scattered about on the floor. Although Mrs. Raybun had been open for business during the day, no currency was found at the scene of the crime or in Mrs. Raybun's pocketbook. Susan Chambers testified that earlier, at about 3:30 p.m., Mrs. Raybun had given her money and that Mrs. Raybun had "quite a bit" of other money (although an indeterminate amount) remaining in her pocketbook.

Mrs. Raybun had driven herself to the Bridal Shop to work and had intended to drive from there to her home to meet Susan at around 6:30 p.m., according to testimony of her children. When Susan and Clay arrived at the shop to look for her, Mrs. Raybun's 1978 Buick was not behind the shop in its usual place, nor could police locate it in the vicinity of the Bridal Shop.

Acting on a tip from David Gammage, another of appellant's uncles, Sylvester, Georgia police found the Buick in a church parking lot on Saturday morning following the murder. Appellant had

appeared at the home of his grandmother, Eva Gammage, at between 3 a.m. and 4 a.m. the previous morning, driving the Buick that had been stolen approximately nine hours earlier in Albany. Eva Gammage stated that appellant's visit was unusual and surprising because it had been several months since he had visited and he was not in the habit of traveling to Sylvester. Appellant and one of his uncles who lived with Eva Gammage went out in the car between 4 a.m. and 6 a.m. to buy liquor at a local shot house where drinks could be purchased at any hour. They returned to Gammage's in Sylvester and instead of parking in the yard as he had done on first arriving, appellant left the Buick several blocks up the street and walked back. He gave the key to Joseph Gammage, appellant's co-defendant, and instructed him to return with the car before too long should he decide to use it. Appellant explained that he had somewhere to go later on in the day after getting some sleep. Jackson then went inside Gammage's house and went to sleep at about 6 a.m.

Joseph Gammage then began to work in the yard and did not return to bed. Later in the morning David Gammage, Joseph's brother, walked down to his mother's house where Joseph was mowing the lawn. At that time Joseph told David that the appellant had driven over from Albany in the middle of the night in a new car. Joseph pointed out the car to David and the pair went for a ride in it. David's suspicions were roused because he believed that Jackson did not have the money to buy a new car. He called the police to report his suspicions. Based on his report the car was recovered by Sylvester police later on Saturday morning.

Police first focused their investigation on Joseph Gammage, since he had been seen in the car. He was picked up for questioning and revealed Jackson's involvement in the car's recent history. Police inquired at Eva Gammage's about Jackson but did not find him there on Saturday. Appellant testified that when he awoke, his grandmother told him that the police had inquired about him. To avoid arrest, appellant fled into the woods nearby and remained there for the afternoon and evening of Saturday. Appellant came out of the woods when he saw his mother's car at his grandmother's house. The women tried to persuade appellant to turn himself in, but he refused and they drove him to the house of Babe Wells near Sylvester. It was at Wells' house that appellant was arrested two days later after police were informed of appellant's whereabouts.

At the time of his capture, appellant had discarded his own clothes and was dressed in pants several sizes too large for him. Jackson's mother had taken a bag containing all his clothes back to his apartment in Albany at his request. When Albany police searched Jackson's apartment they recovered a white shirt streaked with

human blood, but experts were unable to say whose blood it was or even to identify it as to type. At the time police apprehended Jackson his arms and wrists were scratched and gouged. Photographs were made of these marks and introduced at trial.

To explain to police his possession of the stolen Buick, appellant described an encounter on Friday evening with a homosexual who had approached him in a bar in Albany and offered to buy him drinks. Jackson accepted and the two drank and drove around in the Buick until the early hours of Saturday morning. At some time after being in the car and in and out of local bars for several hours, the homosexual made advances to Jackson. Jackson forcefully repelled these and protected himself by beating up the homosexual. He abandoned his erstwhile companion along a country road near Albany. Jackson then drove alone in the Buick to Sylvester, Georgia. He attributed the scratches and injuries to his arms to this fight. Jackson could give no more than a general description of the man and did not know his name or anything else about him.

Appellant stated that he ran from police to hide in the woods because he thought he was in trouble for stealing the car the night before from the man who had picked him up. Police in Albany had no reports of assaults upon any persons like the one described by Jackson as the possessor of the Buick. Jackson has not been able to provide any further information about the mysterious stranger with whom he claims to have spent Friday evening.

(1) Appellant contends in his first enumeration of error that the jury verdicts of guilty are without sufficient evidence to support them. We do not agree. While the evidence offered by the state to prove Jackson's guilt was largely circumstantial, viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the appellant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

(2) Appellant argues that the trial court erred in not giving his requested charge on the law of the presumption of innocence. Appellant bases his claim on Taylor v. Kentucky, 436 U. S. 478 (98 SC 1930, 56 LE2d 468) (1978) and urges error in not charging the particular words of the petitioner's requested instruction on the presumption of innocence in that case. "The law presumes a defendant to be innocent of a crime. Thus a defendant, although accused, begins the trial with a 'clean slate.' That is, with no evidence against him. The law permits nothing but legal evidence presented before a jury to be considered in support of any charge against the accused. So the presumption of innocence alone is sufficient to acquit a defendant, unless you are satisfied beyond a reasonable doubt of the

defendant's guilt after careful and impartial consideration of all of the evidence in the case." Instead of the above charge, the court in the present case charged the jury concerning innocence as follows: "The fact that the defendants have been indicted by the Grand Jury raises no presumption or inference whatsoever against them. You will not take the fact that an indictment has been preferred against the defendants as having any probative or evidentiary force or value whatever . . . Before the state is entitled to a verdict of conviction of the defendants, the burden is upon the state to prove the defendant's guilt as charged, beyond a reasonable doubt. The burden never shifts to the accused to prove his innocence. The defendant enters upon his trial, and when I use it in the singular, I am referring to both of them — with the presumption of innocence in his favor and this presumption remains with him throughout the trial, unless and until it is overcome by evidence sufficiently strong to satisfy you of his guilt to a reasonable and moral certainty and beyond a reasonable doubt . . . Every person is presumed innocent until proven guilty. No person shall be convicted of a crime unless each element of such crime is proved beyond a reasonable doubt." We hold that the charge as given was a complete charge on the presumption of innocence and the burden placed on the state. It is not necessary to give the precise language of a request to charge when the principles upon which the jury must make its decision are clearly explained. Taylor v. Kentucky, supra. *Herrmann v. State,* 235 Ga. 400, 402 (220 SE2d 2) (1975). This enumeration of error is without merit.

(3) The trial court denied appellant's pre-trial motion to appoint an expert at the state's expense. Appellant contends that it was error to deny him the services of an independent expert who would review scientific tests conducted by the state and perform additional investigations as necessary in order to conduct a complete and adequate defense.

The rule in this state is clear. " 'The granting or denial of a motion for appointment of expert witnesses lies within the sound discretion of the trial court. Unless there has been an abuse of discretion, the trial court's ruling will be upheld.' " *Moore v. State,* 240 Ga. 807, 813 (243 SE2d 1) (1978); *Patterson v. State,* 239 Ga. 409 (238 SE2d 2) (1977).

Appellant has not shown how he was harmed by being denied the services of an independent expert. The qualifications of the state's experts were not challenged and there is no allegation of bias. Nor has appellant shown what additional tests his experts would perform or what new testimony they would present. Jackson acknowledges that he had available to him by discovery the results of tests conducted by the state crime laboratory. At trial counsel cross-examined the

experts who conducted these tests. In light of these facts we hold that it was not an abuse of the trial court's discretion to deny appellant's request for experts.

Jackson urges that his case is controlled by Little v. Streater, 452 U. S. 1 (101 SC 2202, 68 LE2d 627) (1981), a paternity case involving blood tests. A Connecticut statute provided that the costs of such tests were to be chargeable to the party who requested them. Connecticut law also put the defendant in a paternity suit at a disadvantage in that his testimony alone was insufficient to overcome the plaintiff's prima facie case. Denying free tests to indigents "forecloses what is potentially a conclusive means for an indigent defendant to surmount that disparity and exonerate himself." Little v. Streater, 452 U. S. 1, 12. In the present case appellant has not shown that he labors under an evidentiary burden like that imposed by the Connecticut law. Nor is there a conclusive scientific test unavailable to Jackson because of his indigence by which he could have exonerated himself. Little is not controlling here.

(4) Appellant contends that it was error to deny his pre-trial motion seeking appointment of experienced counsel. Prior to trial Jackson objected to his appointed attorney and requested more experienced counsel, specifically one "that handles murder cases only." The motion was denied. The court found that the defendant's court-appointed counsel was an "able and experienced trial attorney." The record does not reflect the extent of counsel's trial experience, although counsel points out that it was his first defense of a capital case.

Appellant does not assert any omissions on the part of trial counsel in his conduct of the proceedings below. The record shows that appellant's trial counsel took the following actions in his defense; (a) he moved to sever for purposes of trial the four-count indictment; (b) demanded a list of witnesses; (c) demanded the appointment of an expert at state expense; (d) conducted discovery (Brady motion); (e) objected to introduction of certain evidence at trial; (f) cross-examined the state's witnesses; and (g) presented witnesses and evidence on behalf of the appellant's case.

In the landmark decision of MacKenna v. Ellis, 280 F2d 592 (1960), the 5th Circuit Court of Appeals abandoned the traditional sham, farce, or mockery-of-justice standard for determining the effectiveness of counsel and recognized the constitutional right to assistance of counsel as meaning "not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." Id. at 599. In *Pitts v. Glass,* 231 Ga. 638 (203 SE2d 515) (1974), this court expressed approval of the standard for determining the effectiveness

of counsel enunciated in MacKenna, supra.

Applying these legal standards to the facts and circumstances of the present case as found in the record before us, we cannot say that the defendant was denied his constitutional right to assistance of counsel. See *Hawes v. State,* 240 Ga. 327 (240 SE2d 833) (1977). The court-appointed counsel, despite his lack of experience in capital cases, rendered reasonably effective assistance and appellant's trial counsel was not so ineffective as to deny him due process of law.

(5) Appellant asserts that it was error to deny his pre-trial motion for discovery. The record does not show that appellant was unable to obtain any item to which he was entitled under his Brady motion. He has failed to show what evidence has been withheld or suppressed nor has he shown the materiality of that evidence. *Stevens v. State,* 242 Ga. 34 (247 SE2d 838) (1978). Accordingly, we find this enumeration of error to be without merit.

(6) In his sixth enumeration of error, Jackson alleges that the trial court erred in failing to grant his motion for severance. In a pre-trial motion appellant requested severance of the two co-defendants and for a severance of the four counts against him.

As to the co-defendants, the rule in Georgia is laid down by the legislature. "When two or more defendants are jointly indicted for a capital offense, any defendant so electing shall be separately tried unless the State shall waive the death penalty . . . [the] defendants may be tried jointly or separately in the discretion of the trial court." Ga. Code Ann. § 27-2101. In the present case the state did not seek the death penalty and thus committed the question of severing the co-defendants to the discretion of the trial court.

In exercising this discretion there are three elements which the trial court should consider. First, whether a joint trial will create confusion of evidence and law. Second, whether there is danger that evidence implicating one defendant will be considered against the other despite cautionary instructions to the contrary. Third, whether the co-defendants will press antagonistic defenses. *Cain v. State,* 235 Ga. 128 (218 SE2d 856) (1975).

In the present case appellant argues that the presence of Gammage caused prejudice to appellant's case because evidence was introduced pertaining solely to Gammage. While it is true that certain evidence was introduced pertaining solely to Gammage, appellant has not shown how this evidence prejudiced his own case or met the test of *Cain,* supra. Therefore we hold this portion of the enumeration of error to be without merit.

Appellant also complains that it was unfair to force him to defend against four felony charges at once, since this would create in

the jury's mind an inference of guilt by sheer weight of the number of charges against him. The underlying consideration regarding the issue of a joint trial on two or more indictments is whether undue or great risk of prejudice from a joint disposition of charges would result. *Dingler v. State,* 233 Ga. 462 (211 SE2d 752) (1975). Where the joinder is based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the discretion of the trial judge. *Coats v. State,* 234 Ga. 659 (217 SE2d 260) (1975).

The facts and circumstances of the trial as reflected in the record on appeal present no evidence of prejudice or abuse of the trial court's discretion. *Wilson v. State,* 245 Ga. 49 (4) (262 SE2d 810) (1980). The four crimes of which Jackson was accused were part of a continuous series of actions and conduct. We find no merit in this enumeration of error.

(7) Finally, appellant asserts as error the conduct of the prosecution, which he argues deprived him of a fair trial. Appellant points to the prosecutor's examination of a fingerprint expert for the state. The expert was unable to testify that prints found at the crime scene matched Jackson's. The expert did find that there were some points of similarity, but an insufficient number to meet the test used by the expert to determine identity.

The witness testified that when he communicated his inability to prove the identity of the prints to the District Attorney, he was asked if he knew or could find someone who would testify to an identification based on the similarities that were found. The expert testified that he did not know of such a person and told the District Attorney that he would not look for one. There was further testimony from the same expert regarding the different tests and standards employed by various law enforcement agencies, such as the Federal Bureau of Investigation, in identifying prints. At no time was there testimony that the fingerprints belonged to Jackson or anyone else. Appellant had opportunity to question the expert on the fingerprints lifted from objects at the crime scene, and he conducted a thorough and searching cross-examination. Accordingly, we find no merit in this enumeration.

*Judgment affirmed. All the Justices concur, except Hill, P. J., who concurs in the judgment only.*

DECIDED SEPTEMBER 8, 1982.

*Lee & Davis, C. Nathan Davis,* for appellant.
*Hobart M. Hind, District Attorney, John W. Hogg, Assistant*

*District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.