## LITTLE v. STREATER

No. 79–6779.  Argued January 13, 1981—Decided June 1, 1981

BURGER, C. J., delivered the opinion for a unanimous Court.

*Jon C. Blue,* by appointment of the Court, 449 U. S. 948, argued the cause and filed a brief for appellant.

*Stephen J. McGovern,* Assistant Attorney General of Connecticut, argued the cause for appellee. With him on the brief was *Carl R. Ajello,* Attorney General.*

---

*Bruce J. Ennis, Jr.,* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

CHIEF JUSTICE BURGER delivered the opinion of the Court.

This appeal presents the question whether a Connecticut statute, which provides that in paternity actions the cost of blood grouping tests is to be borne by the party requesting them, violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment when applied to deny such tests to indigent defendants.

## I

On May 21, 1975, appellee Gloria Streater, while unmarried, gave birth to a female child, Kenyatta Chantel Streater. As a requirement stemming from her child's receipt of public assistance, appellee identified appellant Walter Little as the child's father to the Connecticut Department of Social Services. See Conn. Gen. Stat. § 46b–169 (1981). The Department then provided an attorney for appellee to bring a paternity suit against appellant in the Court of Common Pleas at New Haven to establish his liability for the child's support.[1]

At the time the paternity action was commenced, appellant was incarcerated in the Connecticut Correctional Institution at Enfield. Through his counsel, who was provided by a legal aid organization, appellant moved the trial court to order blood grouping tests on appellee and her child pursuant to Conn. Gen. Stat. § 52–184 (1977), which later became Conn. Gen. Stat. § 46b–168 (1981) and includes the provision that "[t]he costs of making such tests shall be chargeable against the party making the motion."[2]   Appel-

---

[1] While the case was pending, the Court of Common Pleas was merged with the Superior Court of Connecticut. See Conn. Gen. Stat. § 51–164s (1981).

[2] In its entirety, Conn. Gen. Stat. § 46b–168 (1981) states:

"In any proceeding in which a question of paternity is an issue, the court, on motion of any party, may order the mother, her child and the putative father or the husband of the mother to submit to one or more blood grouping tests, to be made by a qualified physician or other qualified per-

lant asserted that he was indigent [3] and asked that the State be ordered to pay for the tests. The trial court granted the motion insofar as it sought blood grouping tests but denied the request that they be furnished at the State's expense. App. 8.

For "financial reasons," no blood grouping tests were performed even though they had been authorized. *Id.*, at 12. The paternity action was tried to the court on September 28, 1978. Both appellee and appellant, who was still a state prisoner, testified at trial. *Id.*, at 14–19.[4] After listening to the testimony, the court found that appellant was the child's father. *Id.*, at 2, 20. Following a subsequent hearing on damages, the court entered judgment against appellant in the amount of $6,974.48, which included the "lying-in" expenses of appellee and the child, "accrued maintenance" through October 31, 1978, and the "costs of suit plus reasonable attorney's fees." *Ibid.* In addition, appellant was ordered to pay child support at the rate of $2 per month—$1 toward the arrearage amount of $6,974.48 and $1 toward a current monthly award of $163.58—directly to Connecticut's Department of Finance and Control. *Id.*, at 20–21.[5]

---

son, designated by the court, to determine whether or not the putative father or the husband of the mother can be excluded as being the father of the child. The results of such tests shall be admissible in evidence only in cases where such results establish definite exclusion of the putative father or such husband as such father. The costs of making such tests shall be chargeable against the party making the motion."

[3] Appellant's financial affidavit, which was filed with the motion, showed that he had weekly income of $5, expenses of $5, and no assets. App. 7. The trial court later specifically found that, at the time of the motion, appellant "was indigent and could not afford to pay the costs for blood grouping tests." *Id.*, at 23.

[4] Although appellant admitted intimacy with appellee, he expressed doubt that he was the child's father because of appellee's alleged relationship with another man and because she had not allowed him to see the child. *Id.*, at 17–18.

[5] The minimal sum of $2 was ordered presumably because appellant was indigent and incarcerated. However, his payments to the State are sub-

The Appellate Session of the Connecticut Superior Court affirmed the trial court's judgment in a *per curiam* opinion that is not officially reported. Relying on its prior decision in *Ferro* v. *Morgan,* 35 Conn. Supp. 679, 406 A. 2d 873, cert. denied, 177 Conn. 753, 399 A. 2d 526 (1979), the Appellate Session held that Conn. Gen. Stat. § 46b–168 (1981) does not violate the due process and equal protection rights of an indigent defendant in a paternity proceeding. The Appellate Session thus found no error in the trial court's denial of appellant's motion that the cost of blood grouping tests be paid by the State. App. 25–26.

Thereafter, appellant's petition for certification was denied by the Connecticut Supreme Court, 180 Conn. 756, 414 A. 2d 199 (1980); and we noted probable jurisdiction, 449 U. S. 817 (1980).

## II

The Fourteenth Amendment provides in part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." Appellant argues that his right to due process was abridged by the refusal, under Conn. Gen. Stat. § 46b–168 (1981), to grant his request based on indigency for state-subsidized blood grouping tests.

Due process, "unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Facist Refugee Committee* v. *McGrath,* 341 U. S. 123, 162 (1951) (concurring opinion). Rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). In *Boddie* v. *Connecticut,* 401 U. S. 371, 377 (1971), the Court held that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced

ject to future increase pursuant to Conn. Gen. Stat. § 46b–171 (1981), which provides that "[a]ny order for the payment of [child] support . . . may at any time thereafter be set aside or altered by any court issuing such order."

to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Accord, *Armstrong* v. *Manzo*, 380 U. S. 545, 552 (1965); *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U. S. 306, 313 (1950). And in *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976), we explained:

> "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

These standards govern appellant's due process claim, which is premised on the unique quality of blood grouping tests as a source of exculpatory evidence, the State's prominent role in the litigation, and the character of paternity actions under Connecticut law.

## A

The discovery of human blood groups by Dr. Karl Landsteiner in Vienna at the beginning of this century, and subsequent understanding of their hereditary aspects, made possible the eventual use of blood tests to scientifically evaluate allegations of paternity. P. Speiser & F. Smekal, Karl Landsteiner 89–93 (1975). Like their European counterparts, American courts gradually recognized the evidentiary value of blood grouping tests in paternity cases, and the modern status of such tests has been described by one commentator as follows:

> "As far as the accuracy, reliability, dependability— even infallibility—of the test are concerned, there is no

longer any controversy. The result of the test is universally accepted by distinguished scientific and medical authority. There is, in fact, no living authority of repute, medical or legal, who may be cited adversely. . . . [T]here is now . . . practically universal and unanimous judicial willingness to give decisive and controlling evidentiary weight to a blood test exclusion of paternity." S. Schatkin, Disputed Paternity Proceedings § 9.13 (1975).

The application of blood tests to the issue of paternity results from certain properties of the human blood groups and types: (a) the blood group and type of any individual can be determined at birth or shortly thereafter; (b) the blood group and type of every individual remain constant throughout life; and (c) the blood groups and types are inherited in accordance with Mendel's laws. *Id.*, § 5.03. If the blood groups and types of the mother and child are known, the possible and impossible blood groups and types of the true father can be determined under the rules of inheritance. For example, a group AB child cannot have a group O parent, but can have a group A, B, or AB parent. Similarly, a child cannot be type M unless one or both parents are type M, and the factor rh′ cannot appear in the blood of a child unless present in the blood of one or both parents. *Id.*, §§ 5.03 and 6.02. Since millions of men belong to the possible groups and types, a blood grouping test cannot conclusively establish paternity. However, it can demonstrate nonpaternity, such as where the alleged father belongs to group O and the child is group AB. It is a negative rather than an affirmative test with the potential to scientifically exclude the paternity of a falsely accused putative father.

The ability of blood grouping tests to exonerate innocent putative fathers was confirmed by a 1976 report developed jointly by the American Bar Association and the American

Medical Association. Miale, Jennings, Rettberg, Sell, & Krause, Joint AMA–ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Family L. Q. 247 (Fall 1976). The joint report recommended the use of seven blood test "systems"—ABO, Rh, MNSs, Kell, Duffy, Kidd, and HLA—when investigating questions of paternity. *Id.,* at 257–258. These systems were found to be "reasonable" in cost and to provide a 91% cumulative probability of negating paternity for erroneously accused Negro men and 93% for white men. *Id.,* at 254, 257–258.

The effectiveness of the seven systems attests the probative value of blood test evidence in paternity cases. The importance of that scientific evidence is heightened because "[t]here are seldom accurate or reliable eyewitnesses since the sexual activities usually take place in intimate and private surroundings, and the self-serving testimony of a party is of questionable reliability." Larson, Blood Test Exclusion Procedures in Paternity Litigation: The Uniform Acts and Beyond, 13 J. Fam. L. 713 (1973–1974). As JUSTICE BRENNAN wrote while a member of the Appellate Division of the New Jersey Superior Court:

> "[I]n the field of contested paternity . . . the truth is so often obscured because social pressures create a conspiracy of silence or, worse, induce deliberate falsity.
>
> "The value of blood tests as a wholesome aid in the quest for truth in the administration of justice in these matters cannot be gainsaid in this day. Their reliability as an indicator of the truth has been fully established. The substantial weight of medical and legal authority attests their accuracy, not to prove paternity, and not always to disprove it, but 'they can disprove it conclusively in a great many cases provided they are administered by specially qualified experts' . . . ." *Cortese* v. *Cortese,* 10 N. J. Super. 152, 156, 76 A. 2d 717, 719 (1950).

## B

Appellant emphasizes that, unlike a common dispute between private parties, the State's involvement in this paternity proceeding was considerable and manifest, giving rise to a constitutional duty. Because appellee's child was a recipient of public assistance, Connecticut law compelled her, upon penalty of fine and imprisonment for contempt, "to disclose the name of the putative father under oath and to institute an action to establish the paternity of said child." Conn. Gen. Stat. § 46b–169 (1981). See *Maher* v. *Doe,* 432 U. S. 526 (1977); *Roe* v. *Norton,* 422 U. S. 391 (1975).[6] The State's Attorney General automatically became a party to the action, and any settlement agreement required his approval or that of the Commissioner of Human Resources or Commissioner of Income Maintenance. See Conn. Gen. Stat. §§ 46b–160 and 46b–170 (1981). The State referred this mandatory paternity suit to appellee's lawyer "for prosecution" and paid his fee as well as all costs of the litigation. App. 10, 20; Tr. of Oral Arg. 30, 34, 40.[7] In addition, the State will be the recipient of the monthly support payments to be made by appellant pursuant to the trial court's judgment. App. 21. "State action" has undeniably pervaded this case. Accordingly, appellant need not, and does not, contend that Connecticut has a constitutional obligation to

---

[6] In response to an interrogatory, appellee, through her attorney, stated that her "continuing eligibility for [public] assistance required her to disclose [the] father's identity." App. 10.

Connecticut's disclosure requirement is fostered by 42 U. S. C. § 654 (4), which directs that, as to any child born out of wedlock for whom benefits under the Aid to Families with Dependent Children program are claimed, the states must undertake "to establish . . . paternity . . . unless . . . it is against the best interests of the child to do so" and "to secure support for such child from his parent." See also 45 CFR § 232.12 (1980).

[7] At oral argument, the Assistant Attorney General of Connecticut acknowledged that the cost of any witnesses for the plaintiff in a proceeding such as this also would be paid by the State. Tr. of Oral Arg. 45.

fund blood tests for an indigent's defense in ordinary civil litigation between private parties.

The nature of paternity proceedings in Connecticut also bears heavily on appellant's due process claim. Although the State characterizes such proceedings as "civil," see *Robertson* v. *Apuzzo,* 170 Conn. 367, 372–373, 365 A. 2d 824, 827–828, cert. denied, 429 U. S. 852 (1976), they have "quasi-criminal" overtones. Connecticut Gen. Stat. § 46b–171 (1981) provides that if a putative father "is found *guilty,* the court shall order him to stand charged with the support and maintenance of such child" (emphasis added); and his subsequent failure to comply with the court's support order is punishable by imprisonment under Conn. Gen. Stat. §§ 46b–171, 46b–215, and 53–304 (1981). Cf. *Walker* v. *Stokes,* 45 Ohio App. 2d 275, 278, 344 N. E. 2d 159, 161 (1975); *People* v. *Doherty,* 261 App. Div. 86, 87, 24 N. Y. S. 2d 821, 823 (1941).

Moreover, the defendant in a Connecticut paternity action faces an unusual evidentiary obstacle. Connecticut's original "bastardy" statute was enacted in 1672, see The Book of the General Laws for the People Within the Jurisdiction of Connecticut 6 (1673), and from 1702 until 1902 it stated in pertinent part: "And if such woman shall continue constant in her accusation, being put to the discovery in the time of her travail, and also examined on the trial of the cause, it shall be prima facie evidence that such accused person is the father of such child." *Mosher* v. *Bennett,* 108 Conn. 671, 672, 144 A. 297 (1929). In *Booth* v. *Hart,* 43 Conn. 480 (1876), the Connecticut Supreme Court construed this statutory language as follows:

> "[For 146 years], parties to suits with but one exception could not testify in their own behalf. But in cases of illegitimate children, . . . an exception was made of suits brought by [a mother] for the maintenance of [her] child, and she was allowed to testify who was its father

under certain safeguards provided by the statute. And the statute went on to provide that if she should continue constant in her accusation, being examined on oath and put to the discovery in the time of her travail, the person whom she declared to be the father of her child should be adjudged to be so, unless from the evidence introduced by him the triers should be of the opinion that he was innocent of the charge. The existence of these few facts were all that was necessary to maintain the suit in the first instance, and the burden of proof then changed to the defendant, and he was required to prove himself innocent of the accusation by other evidence than his own." *Id.*, at 485.

In 1848, the Connecticut Legislature enacted a statute providing that "[n]o person shall be disqualified as a witness in any action by reason of his interest in the event of the same, as a party or otherwise." *Id.*, at 486. Since the defendant in a paternity action was no longer precluded from testifying in his own behalf, the 1848 statute removed the need for the safeguard of putting the complainant "to the discovery in the time of her travail." *Ibid.* In its modern form, Conn. Gen. Stat. § 46b–160 (1981) simply states that "if such mother or expectant mother continues constant in her accusation, it shall be evidence that the respondent is the father of such child." Nevertheless, in *Mosher* v. *Bennett, supra,* at 674, 144 A., at 298, the Connecticut Supreme Court held:

"The mother still has the right to rely upon the prima facie case made out by constancy in her accusation. She is no longer required under oath to make such discovery at the time of her travail. *The prima facie case so made out places upon the reputed father the burden of showing his innocence of the charge, and under our practice he must do this by other evidence than his own.*" (Emphasis added.)

Accord, *Kelsaw* v. *Green*, 6 Conn. Cir. 516, 519–520, 276 A. 2d 909, 911–912 (1971).[8]

Under Connecticut law, therefore, the defendant in a paternity suit is placed at a distinct disadvantage in that his testimony alone is insufficient to overcome the plaintiff's prima facie case. Among the most probative additional evidence the defendant might offer are the results of blood grouping tests, but if he is indigent, the State essentially denies him that reliable scientific proof by requiring that he bear its cost. See Conn. Gen. Stat. § 46b–168 (1981). In substance, the State has created an adverse presumption regarding the defendant's testimony by elevating the weight to be accorded the mother's imputation of him. If the plaintiff has been "constant" in her accusation of paternity, the defendant carries the burden of proof and faces severe penalties if he does not meet that burden and fails to comply with the judgment entered against him. Yet not only is the State inextricably involved in paternity litigation such as this and responsible for an imbalance between the parties, it in effect forecloses what is potentially a conclusive means for an indigent defendant to surmount that disparity and exonerate himself. Such a practice is irreconcilable with the command of the Due Process Clause.

---

[8] At oral argument, the State's Assistant Attorney General represented that "[c]urrently th[is] is the law of Connecticut," *id.*, at 46; and, when presented with a hypothetical situation, his response illustrated the practical operation of the evidentiary rule:

"QUESTION: [D]oes that mean . . . that [if] she takes the stand [and says], he's the father, he's the father, he's the father, he's the father. She never deviates. . . . He takes the stand and says, I am not, I am not, I am not, I am not. And the factfinder believes him and doesn't believe her, you're saying—

.            .            .            .

"[COUNSEL'S ANSWER]: If that was the testimony, she would win." *Id.*, at 44.

## C

Our holding in *Mathews* v. *Eldridge,* 424 U. S., at 335, set forth three elements to be evaluated in determining what process is constitutionally due: the private interests at stake; the risk that the procedures used will lead to erroneous results and the probable value of the suggested procedural safeguard; and the governmental interests affected. Analysis of those considerations weighs in appellant's favor.

The private interests implicated here are substantial. Apart from the putative father's pecuniary interest in avoiding a substantial support obligation and liberty interest threatened by the possible sanctions for noncompliance, at issue is the creation of a parent-child relationship. This Court frequently has stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection. See *Stanley* v. *Illinois,* 405 U. S. 645, 651–652 (1972). Just as the termination of such bonds demands procedural fairness, see *Lassiter* v. *Department of Social Services, post,* p. 18, so too does their imposition. Through the judicial process, the State properly endeavors to identify the father of a child born out of wedlock and to make him responsible for the child's maintenance. Obviously, both the child and the defendant in a paternity action have a compelling interest in the accuracy of such a determination.[9]

---

[9] In its Report on the 1974 Social Services Amendments to the Social Security Act, 42 U. S. C. §§ 654, 655, et al., the Senate Finance Committee stated:

"In taking the position that a child born out of wedlock has a right to have its paternity ascertained in a fair and efficient manner, the [C]ommittee acknowledges that legislation must recognize the interest primarily at stake in the paternity action to be that of the child. . . . The Committee is convinced that . . . paternity can be ascertained with reasonable assurance, particularly through the use of scientifically conducted blood typing." S. Rep. No. 93–1356, p. 52 (1974).

See n. 6, *supra.*

14

Given the usual absence of witnesses, the self-interest coloring the testimony of the litigants, and the State's onerous evidentiary rule and refusal to pay for blood grouping tests, the risk is not inconsiderable that an indigent defendant in a Connecticut paternity proceeding will be erroneously adjudged the father of the child in question. See generally H. Krause, Illegitimacy: Law and Social Policy 106–108 (1971). Further, because of its recognized capacity to definitively exclude a high percentage of falsely accused putative fathers, the availability of scientific blood test evidence clearly would be a valuable procedural safeguard in such cases. See *id.*, at 123–137; Part II–A, *supra*. Connecticut has acknowledged as much in § 46b–168 of its statutes by providing for the ordering of blood tests and the admissibility of negative findings. See n. 2, *supra*. Unlike other evidence that may be susceptible to varying interpretation or disparagement, blood test results, if obtained under proper conditions by qualified experts, are difficult to refute. Thus, access to blood grouping tests for indigent defendants such as appellant would help to insure the correctness of paternity decisions in Connecticut.

The State admittedly has a legitimate interest in the welfare of a child born out of wedlock who is receiving public assistance, as well as in securing support for the child from those legally responsible. In addition, it shares the interest of the child and the defendant in an accurate and just determination of paternity. See Regulations of Connecticut State Agencies § 17–82e–4 (1979). Nevertheless, the State also has financial concerns; it wishes to have the paternity actions in which it is involved proceed as economically as possible and, hence, seeks to avoid the expense of blood grouping tests.[10] Pursuant to 42 U. S. C. § 655 (a)(1) (1976 ed. and

---

[10] Laboratories surveyed in a 1977 study sponsored by the Department of Health, Education, and Welfare (now in part the Department of Health and Human Services) charged an average of approximately $245 for a

Supp. III), however, the states are entitled to reimbursement of 75% of the funds they expend on operation of their approved child support plans, and regulations promulgated under authority of 42 U. S. C. § 1302 make clear that such federal financial participation is available for the development of evidence regarding paternity, "including the use of . . . blood tests." 45 CFR § 304.20 (b)(2)(i)(B) (1980). Moreover, following the example of other states, the expense of blood grouping tests for an indigent defendant in a Connecticut paternity suit could be advanced by the State and then taxed as costs to the parties. See Ark. Stat. Ann. § 34.705.1 (1962); Kan. Stat. Ann. § 23–132 (1974); La. Rev. Stat. § 9:397.1 (West Supp. 1981); N. H. Rev. Stat. Ann. § 522:3 (1974); Ore. Rev. Stat. § 109.256 (1) (1979); 42 Pa. Cons. Stat. Ann. § 6135 (Purdon Supp. 1981); Tex. Fam. Code Ann. § 13.03 (b) (Vernon Supp. 1980–1981).[11] We must con-

---

battery of test systems that led to a minimum exclusion rate of 80%. HEW Office of Child Support Enforcement, Blood Testing to Establish Paternity 35–37 (1977 Condensed Report). According to appellant, blood grouping tests were available at the Hartford Hospital for $250 at the time this paternity action was pending trial, but the cost has since been increased to $460. Brief for Appellant 4, and n. 5.

[11] Other jurisdictions also have statutes by which blood grouping tests can be made available to indigents. See, e. g., Ala. Code § 26–12–5 (1977); D. C. Code § 16–2343 (Supp. V 1978); Haw. Rev. Stat. § 584–16 (1976); Md. Ann. Code § 16–66G (Supp. 1980); Mich. Comp. Laws § 722.716 (c) (1970); Minn. Stat. § 257.69 (2) (1980); N. D. Cent. Code § 14–17–15 (Supp. 1977); Utah Code Ann. § 78–25–23 (1977); Wis. Stat. Ann. § 767.48 (5) (West Supp. 1980). In addition, the highest courts of Colorado, Massachusetts, and West Virginia have held that putative fathers may not constitutionally be denied access to blood grouping tests on the basis of indigency. See Franklin v. District Court, 194 Colo. 189, 571 P. 2d 1072 (1977); Commonwealth v. Possehl, 355 Mass. 575, 246 N. E. 2d 667 (1969); State ex rel. Graves v. Daugherty, 266 S. E. 2d 142 (W. Va. 1980).

Apart from Connecticut, it also appears that North Carolina requires all defendants requesting blood tests in paternity proceedings, irrespective of means, "to initially be responsible for any of the expenses thereof" or do without them. N. C. Gen. Stat. § 8–50.1 (b)(2) (Supp. 1979).

clude that the State's monetary interest "is hardly significant enough to overcome private interests as important as those here." *Lassiter* v. *Department of Social Services, post,* at 28.

Assessment of the *Mathews* v. *Eldridge* factors indicates that appellant did not receive the process he was constitutionally due. Without aid in obtaining blood test evidence in a paternity case, an indigent defendant, who faces the State as an adversary when the child is a recipient of public assistance and who must overcome the evidentiary burden Connecticut imposes, lacks "a meaningful opportunity to be heard." *Boddie* v. *Connecticut,* 401 U. S., at 377.[12] Therefore, "the requirement of 'fundamental fairness' " expressed by the Due Process Clause was not satisfied here. *Lassiter* v. *Department of Social Services, post,* at 24.

## III

"[A] statute . . . may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question." *Boddie* v. *Connecticut,* 401 U. S., at 379. Thus, "a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party's opportunity to be heard." *Id.,* at 380. We hold that, in these specific circum-

---

[12] In *Boddie,* we held that due process prohibits a state from denying an indigent access to its divorce courts because of inability to pay filing fees and costs. However, in *United States* v. *Kras,* 409 U. S. 434 (1973), and *Ortwein* v. *Schwab,* 410 U. S. 656 (1973), the Court concluded that due process does not require waiver of filing fees for an indigent seeking a discharge in bankruptcy or appellate review of an agency determination resulting in reduced welfare benefits. Our decisions in *Kras* and *Ortwein* emphasized the availability of other relief and the less "fundamental" character of the private interests at stake than those implicated in *Boddie.* Because appellant has no choice of an alternative forum and his interests, as well as those of the child, are constitutionally significant, this case is comparable to *Boddie* rather than to *Kras* and *Ortwein.*

stances, the application of Conn. Gen. Stat. § 46b–168 (1981) to deny appellant blood grouping tests because of his lack of financial resources violated the due process guarantee of the Fourteenth Amendment.[13]  Accordingly, the judgment of the Appellate Session of the Connecticut Superior Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

---

[13] Because of our disposition of appellant's due process claim, we need not consider whether the statute, as applied, also violated the Equal Protection Clause.