**Kerrie S. MACHACEK, Kristine Marie Pirkl and County of Steele, Appellants,**

**State of Minnesota by its Attorney General Hubert H. Humphrey III, Intervenor, Appellant,**

v.

**Richard E. VOSS, Respondent (C9–84–538),**

**Kevin John Owen, Respondent (C0–84–539).**

**Nos. C9–84–538, C0–84–539.**

Supreme Court of Minnesota.

Feb. 8, 1985.

Casey J. Christian, Owatonna, for appellants.

Deborah L. Huskins, Sp. Asst. Atty. Gen., St. Paul, for intervenor-appellant Attorney General.

John H. McLoone, IV, Waseca, for respondents.

Nancy K. Jones, Asst. County Atty., for amicus curiae Hennepin County.

SIMONETT, Justice.

We hold that Minn.Stat. § 257.62, subd. 5 (1984), is constitutionally valid and reverse the trial court's contrary ruling.

Minnesota Statutes § 257.62 provides for blood tests to be administered in paternity proceedings. At issue here is subdivision 5, added in 1983, which reads:

> If the results of the blood tests indicate that the likelihood of the alleged father's paternity is more than 92 percent, upon motion the court shall order the alleged father to pay temporary child support determined according to chapter 518. The alleged father shall pay the support money into court pursuant to the rules of civil procedure to await the outcome of the paternity proceedings.

Respondents are defendants in two paternity actions, consolidated here on appeal. Each respondent denies he is the father of the plaintiff-mother's child. Each claims the above statute, by requiring him to pay child support before he has been adjudged to be the father of the child; violates the equal protection and due process clauses of the federal constitution. The trial court agreed with defendants and declared subdivision 5 unconstitutional. Unfortunately,

the trial court has not attached any memo explaining its reasoning.

Blood tests were administered in both paternity actions and showed, in one case, a 98.14% likelihood that the defendant was the father of the child, and, in the other case, a 98.39% likelihood. Co-plaintiff Steele County, with the plaintiff-mothers, then moved for temporary child support under subdivision 5, while defendants countered with a motion for an order declaring the subdivision unconstitutional. The trial court having granted defendants' motions, plaintiffs appealed to the Court of Appeals. We granted that court's request for certification directly to us, accepting the appeals as petitions for discretionary review. The Attorney General has intervened and Hennepin County appears as amicus.

■ 1. First of all, the trial court ruled that subdivision 5 discriminates against alleged fathers on the basis of gender in violation of the equal protection clause. The trial court stated that the statute "does not provide for any examination or consideration of the ability of the mother of the subject child to contribute to such support * * *." We disagree. Subdivision 5 orders the alleged father to pay temporary support "determined according to chapter 518," and sections of that chapter covering child support payments require consideration of the circumstances and financial capabilities of both parents. *See* Minn.Stat. § 518.17 (1984). *See also State ex rel. Forslund v. Bronson,* 305 N.W.2d 748 (Minn.1981). Further, it is expressly provided that maternity as well as paternity may be established under the statutory procedures. Minn.Stat. §§ 257.54, 257.57, 257.71 (1984). There is no gender discrimination; indeed, there is no classification based on gender.

■ 2. The trial court also declared that subdivision 5 discriminates impermissibly "between married established fathers and unmarried alleged fathers." Respondents argue that the statute treats alleged fathers similarly to "established" fathers even though the alleged fathers have not yet been adjudged to be fathers. There is

no merit in this claim. The two classes are not treated the same. Alleged fathers pay their support money into court, refundable if paternity is not later established; support money paid by "established" fathers is applied directly to the child's support.

■ 3. Finally, the trial court held that subdivision 5 deprives the defendants of property without due process of law. Defendant-respondents argue that this is so because the statute takes their property without affording them a "meaningful" hearing. In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the United States Supreme Court, in holding that procedures for termination of Social Security disability benefits complied with due process, set out a three-factor balancing test for determining what process is constitutionally due:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of the additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

As to the first factor, defendants have an affected private interest in the money they pay for temporary support. This sum, however, is set only after the court takes into account, among other things, the defendant's own needs and financial resources. Moreover, defendants are only being denied the temporary use of their money. If a defendant is adjudged not to be the father, his money is refunded. In this context, defendants' private interest is no greater than the interest of the Social Security recipient in *Mathews.* We might add, we think support monies paid into court should ordinarily be deposited in an interest-bearing account. *See* Minn.R. Civ.P. 67.04.

The second factor to be considered is the risk of an erroneous deprivation of the defendants' property under the procedures of subdivision 5. We believe this risk is not great, certainly less than the risk of the erroneous disability termination in *Mathews*. Temporary support may only be ordered if the blood test results indicate a likelihood of paternity of more than 92%. The validity of these tests in paternity determinations is no longer seriously questioned. *Little v. Streater*, 452 U.S. 1, 6–7, 101 S.Ct. 2202, 2205–2206, 68 L.Ed.2d 627 (1981) ("As far as the accuracy, reliability, dependability—even infallibility—of the test are concerned, there is no longer any controversy"). This court, in 1979, recognized "that blood-test procedures provide the most reliable means for making the determination of paternity more accurate and efficient," and at that time we urged the legislature to consider their use in paternity matters. *State ex rel. Ortloff v. Hanson*, 277 N.W.2d 205, 206–07 (Minn. 1979). A year later in *County of Ramsey v. S.M.F.*, 298 N.W.2d 40, 44 (Minn.1980), we stressed that blood tests were to be administered in paternity actions as early as possible in the litigation, noting that it was not sensible to rely any longer solely on other kinds of less reliable evidence. Moreover, subdivision 5 also provides that child support can only be ordered on motion after a hearing. This procedure affords defendant an opportunity to dispute the test results and the child support payments by affidavit or otherwise. Defendant-respondents argue, however, that this opportunity does not constitute a meaningful hearing because they cannot confront and cross-examine the person who administered the blood test. In effect, defendants argue that the only kind of hearing procedure which will satisfy due process is the pater-

nity trial itself. We disagree. Due process, in this context, does not require two separate trials. *Cf. Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Given the reliability of modern, scientific blood and genetic testing, the fact that the test results must indicate a 92% likelihood of paternity, the fact that usually some other evidence also points to the defendant as the father, and the fact that defendant can present rebuttal evidence at the hearing on the motion for child support, we conclude that the risk of a defendant in a paternity action being erroneously deprived of the temporary use of his money under the procedures of subdivision 5 is so small that, when balanced with the other two *Mathews* factors, due process is not offended.

The third factor to be weighed under the *Mathews* test is the government's interest, including the function involved and the fiscal and administrative burdens that different procedural requirements would entail. Here the government's interest lies in the large public expenditures being made to support children not otherwise being supported by their natural parents.[1] It is important for the mother to be assured child support, and, where public assistance is provided, that the assistance program be conducted effectively. The purpose of subdivision 5 is to protect the ability of the mother or the county to collect for past support of a child at such time as paternity is established. Respondents argue there is no need for this protection because an adjudged father can be held liable for past support for a period up to 2 years prior to commencement of the paternity action. Minn.Stat. § 257.66, subd. 4 (1984). Experience shows, however, that collection of back support is not very successful. Back support adds up quickly, and, often, either

---

**1.** In 1983, according to the amicus brief, the Collections Services Division of Hennepin County received 3,369 new referrals to establish paternity for children born out of wedlock who were being supported by Aid to Families with Dependent Children (AFDC), and 900 paternity actions were commenced through the Hennepin County Attorney's office. More than one-fourth of the state's total AFDC is expended in Henne-

pin County, and approximately 70 million dollars will be spent in Hennepin County in 1984 for AFDC. Amicus estimates that at least 25 million dollars of these expenditures will be for children born out of wedlock. Presently, $431 per month is expended for the support of a child and custodial parent on AFDC, of which $246 per month is directly attributable to the child's support.

the adjudged father cannot pay it, or, if he can, his ability to pay current support is impaired. To the extent the county is not able to obtain reimbursement, the taxpayers rather than the parents support the child.

It makes sense, it seems to us, for the legislature to require the alleged father to pay periodic support payments into a court escrow while his paternity action is pending, if tests show more than a 92% likelihood of paternity. This burden on defendant is much less than the burden otherwise imposed on the mother or the county in attempting, after an adjudication of paternity, to collect back support, often only through costly and time-consuming court procedures and often with less than satisfactory success. Thus, implementation of subdivision 5 provides funds to reimburse public expenditures. It may also, we think, speed up the disposition and trial of paternity suits, while, at the same time, the blood tests will discourage groundless suits.

Balancing all three factors of the *Mathews* test, we have no difficulty concluding that subdivision 5 complies with constitutional due process. We further hold that Minn.Stat. § 257.62, subd. 5 (1984), satisfies the equal protection and due process requirements of our state constitution.

Reversed.