924

THE PEOPLE *ex rel.* VERA FORREST, on behalf of Darnell Forrest, Plaintiff-Appellee, v. SIDNEY WINSTON-BEY, Defendant-Appellant.

First District (4th Division)   No. 1—90—2224

Opinion filed August 19, 1993.

Rita A. Fry, Public Defender, of Chicago (Protase M. Tinka, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Y. Jacqueline Perkins and Leonard N. Foster, Assistant State's Attorneys, of counsel), for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The defendant, Sidney Winston-Bey, appeals from a judgment entered against him after a jury found that he was the father of a child born to the plaintiff, Vera Forrest. We consider: (1) whether the jury's verdict was against the manifest weight of the evidence because the

plaintiff's testimony was unreliable; (2) whether the blood test results were probative of parentage when the plaintiff's testimony that she and the defendant had intercourse was insufficient; (3) whether the blood test was reliable; and (4) whether the defendant was denied due process. For the following reasons, we affirm.

The plaintiff filed a paternity action against the defendant on behalf of her 11-year-old son, Darnell Forrest. Prior to trial, the judge ordered the plaintiff, her son, and the defendant to submit to a type IV blood test.

In a jury trial, the plaintiff testified that she first met the defendant in December 1975 while he was living in an apartment on the same floor of the building she lived in. Beginning in April 1976, they had intercourse once or twice a week for three months. Most of the time, they had intercourse in his apartment. They did not use birth control. The plaintiff realized that she was pregnant in June 1976 when she missed her menstrual period; she told the defendant she was pregnant. The plaintiff's child was born on February 6, 1977. She testified that she telephoned the defendant the next day and told him of the birth. She knew the defendant was the father because he was the only man she had intercourse with during the previous 10 months. The plaintiff also testified that the defendant never acknowledged paternity and that she did not know whether he was circumcised.

The plaintiff admitted that she made certain prior statements which were inconsistent with her trial testimony. In her answers to interrogatories, she stated that she first met the defendant in the spring of 1976 and that she first had intercourse with him in May 1976. She also stated that she first told the defendant of the child's birth in the end of February 1977. In her deposition, she testified that she first met the defendant in the fall of 1976, that they had sex once or twice a week for about five or six months, and that they dated on and off for about a year. The plaintiff also testified that the defendant introduced her to his parents and told them that she was pregnant with his child; however, she did not remember their names. The plaintiff explained that the prior statements which conflicted with her trial testimony were mistakes.

Joe Edward Forrest, the plaintiff's brother, testified that he met the defendant in April 1976 while the defendant was dating the plaintiff.

Pravatchi Boonlayangoor was qualified as an expert and testified that he was a supervisor in the laboratory of Cook County Hospital where the blood tests in this case were conducted. He set up the blood testing program at the hospital. He testified that the laboratory

followed the standard operating procedure established by the American Association of Blood Banks and that two independent groups of technologists performed the paternity blood tests on separate but identical blood specimens to insure against error. A type IV blood test was the most accurate and involved the testing of up to 24 genetic systems; a type III test involved up to 20 genetic systems. Although there are 300 genetic systems in red blood cells, a paternity blood test involves only those that are polymorphic, or those that differ between people, and it is not necessary to test all of them to determine paternity. The genetic systems of the mother, alleged father, and child are compared to determine whether the man can be excluded. If the tests do not exclude the man, he is considered to be one of the possible true fathers and a conclusion can be made as to the likelihood of paternity.

When a man is compatible, the results of the test are compared to the gene frequency data table which corresponds to the race the parties identify when their blood is drawn. The tables are based on random samples of donated blood and blood from the paternity testing center and account for four races: black, white, Hispanic, and Oriental. Based on the tables, a cumulative paternity index is calculated which shows how many times the alleged father is more likely to be the father of the child than a random man. Most experts consider a ratio of 100 to 1 significant to indicate paternity; however, Boonlayangoor considered the higher ratio of 500 to 1 significant.

Boonlayangoor testified that, in this case, 22 genetic systems were tested which was between a type III and type IV test and "pretty much" a type IV test. The results were compared to a gene frequency data table for blacks because the parties indicated that was their race. The cumulative paternity index was 477,611, which meant that the defendant was:

> "477,611 times more likely *** to be the father of this particular child when we compare him to the random man and/or if we had to go out and look for another *** black man that could contribute exactly the same genetic paternity to this particular child. We have to test 477,611 black men. Then, we probably come up with another one."

Based on the results of the test, Boonlayangoor testified that the defendant was the father of the plaintiff's son. The results were admitted into evidence without objection from the defendant.

On cross-examination, Boonlayangoor explained that the more genetic systems tested, the more accurate the result would be; however, the laboratory was not performing full type IV tests at the time the

tests were conducted in this case due to budget constraints. He admitted that if other polymorphic systems were tested and one of them excluded the defendant, the cumulative paternity index would have been reduced to zero. He testified that most blacks living in the United States are of mixed race and that the gene frequency data tables do not account for mixed races. He conceded that the statistical side of the test may be inaccurate because the blood pool did not completely reflect the general population. The blood test did not establish that the plaintiff and the defendant had intercourse; the results would have been the same whether or not they had intercourse.

On redirect, Boonlayangoor testified that if other polymorphic genetic systems were tested, the cumulative paternity index could have increased the ratio that the defendant was the father. He also reaffirmed his opinion that the defendant was the father of the plaintiff's child.

In his defense, the defendant testified that he first met the plaintiff in 1975 or 1976 when they were living in the same apartment building. At that time, he was living with the woman he later married and their four children. In 1976, he worked 40 to 80 hours per week. The extent of his conversations with the plaintiff was to say hello and ask how she was. He never invited the plaintiff into his apartment and they did not have a dating relationship. He testified that he was not the father of the plaintiff's son because he never had intercourse with her.

The jury returned a verdict in the plaintiff's favor finding that the defendant was the father of her son and he was ordered to pay $55 per month for support. The defendant now appeals.

OPINION

The defendant first argues that the plaintiff's testimony was unreliable because of prior inconsistent statements and the delay in filing the paternity action. As a result, he contends that the jury's verdict was against the manifest weight of the evidence.

The burden is on the plaintiff in a paternity action to establish paternity by a preponderance of the evidence. (*State of Minnesota ex rel. Gulley v. Caldwell* (1990), 198 Ill. App. 3d 91, 555 N.E.2d 752.) Whether that burden is met is dependent on the credibility of the witnesses and the weight assigned to their testimony which is for the trier of fact to determine. (*Gulley*, 198 Ill. App. 3d 91, 555 N.E.2d 752.) The decision of the trier of fact will not be reversed on appeal unless it is clearly erroneous. *Gulley*, 198 Ill. App. 3d 91, 555 N.E.2d 752.

■ The defendant cites inconsistencies between the plaintiff's trial and deposition testimony and her answers to interrogatories on several issues including when she met the defendant, when they began having intercourse, when she told the defendant of the birth of the child, and whether the defendant admitted he was the father. The plaintiff explained at trial that she made certain mistakes when she testified in her deposition and when she answered the interrogatories. The defendant also relies on the fact that the plaintiff did not file the paternity action until her son was 11 years old. The plaintiff filed this action within the statute of limitations period. (See Ill. Rev. Stat. 1989, ch. 40, par. 2508.) The jury apparently found that the inconsistencies or the delay in filing suit did not warrant discrediting her testimony. It was the jury's responsibility to resolve any conflicts and determine whether her testimony was reliable. The jury made those decisions in the plaintiff's favor and there is no reason for this court to disturb its finding.

The defendant also argues that the blood test results were not probative because the plaintiff's testimony that she and the defendant had intercourse was insufficient.

The plaintiff's testimony alone can be sufficient to establish paternity. (*Gulley*, 198 Ill. App. 3d 91, 555 N.E.2d 752.) Also, as explained in *Gulley*, "[t]he alleged intercourse in a paternity case is frequently carried on clandestinely, and the complainant may be forced to prove her case by circumstantial evidence." *Gulley*, 198 Ill. App. 3d at 97, 555 N.E.2d at 755.

The Supreme Court has recognized that "blood tests are highly probative in proving paternity." *Mills v. Habluetzel* (1982), 456 U.S. 91, 98 n.4, 71 L. Ed. 2d 770, 777 n.4, 102 S. Ct. 1549, 1554 n.4, citing *Little v. Streater* (1981), 452 U.S. 1, 68 L. Ed. 2d 627, 101 S. Ct. 2202.

■ In this case, the plaintiff presented evidence that she had intercourse with the defendant during the period of conception. She testified that they began having intercourse about twice a week from April 1976 to June 1976, they did not use birth control, and the defendant was the only person she had intercourse with during that time. Further, her brother testified that the defendant and the plaintiff were dating during that time. The defendant counters with Boonlayangoor's testimony that the blood test results did not establish that the plaintiff and the defendant had intercourse and that the results would have been the same if they did not have intercourse. However, the plaintiff's testimony was not " 'cancelled' " merely because the defendant denied they had intercourse. (See *Gulley*, 198 Ill. App. 3d

at 97, 555 N.E.2d at 756.) Despite the defendant's argument that he was overworked at the time and it was unlikely that he could have had intercourse with the plaintiff in an apartment he shared with his future wife and their four children, the jury disregarded that testimony. The plaintiff's evidence was sufficient, if the jury believed it, to establish that the defendant was the father of the plaintiff's child. The blood test result was probative.

The defendant also challenges the reliability of the blood test because it only tested 22 genetic systems, because the gene frequency data tables did not account for people of mixed race, and because it relied on statistics.

■ The defendant relies primarily on an article written by Boonlayangoor which explains the procedure and reliability of paternity blood tests. (See Boonlayangoor, Telischi, and Paulsen, *Paternity Blood Testing: Analysis, Interpretation and Selection of a Program to Verify Parentage*, 1987 Ill. B.J. 278.) This article does not support the defendant's argument that the test performed here was unreliable; in fact, the article recommends that practitioners request a minimum of type III testing.

The only case that the defendant cites is *Mills* (456 U.S. 91, 71 L. Ed. 2d 770, 102 S. Ct. 1549), which did not consider whether blood tests were reliable. However, the Court stated in a footnote:

"Traditional blood tests do not prove paternity. They prove nonpaternity, excluding from the class of possible fathers a high percentage of the general male population. [Citation.] Thus, the fact that a certain male is not excluded by these tests does not prove that he is the child's natural father, only that he is a member of the limited class of possible fathers." *Mills*, 456 U.S. at 98 n.4, 71 L. Ed. 2d at 777 n.4, 102 S. Ct. at 1554 n.4.

Boonlayangoor testified that the test performed here was between a type III and a type IV and "pretty much" a type IV. He also testified that it was not necessary to test most of the 300 genetic systems that were not tested because they do not differ between individuals. Although he testified that the more systems that are tested the more accurate the test result would be, it was his opinion, based on the 22 systems tested, that the defendant was the father of the plaintiff's son. Further, despite the defendant's argument that the blood test result was invalid because the gene frequency data tables do not account for mixed races, there was no evidence here, as the defendant concedes, that he was of mixed race. The defendant also asserts that the statistical part of the test was just a "gambling game." He refers to the cumulative paternity index which determines the probability

that a man is the father of the child based on the genetic matchups from the blood test. Boonlayangoor explained that the defendant was a possible father of the plaintiff's child and that it was possible that millions of other men could be possible fathers. However, the defendant ignores that Boonlayangoor also testified that a cumulative paternity index of 500 to 1 was a significant indication of paternity and that, here, the cumulative paternity index was 477,611 to 1. Despite the possibility that another man could be the father, it was Boonlayangoor's opinion that the defendant was the father of the plaintiff's son.

The jury heard all of the evidence and it had the responsibility to determine whether the blood test was reliable. In this case, the jury found it was reliable and, based on Boonlayangoor's testimony, that finding was not clearly erroneous.

The defendant also maintains that the failure to perform a full type IV test violated his constitutional right to due process. He relies on *Little* (452 U.S. 1, 68 L. Ed. 2d 627, 101 S. Ct. 2202), where the Court reversed a finding of paternity based solely on the mother's testimony recognizing that blood test evidence would have been a valuable procedural safeguard. The Court held that an alleged father was deprived of due process when a State statute required him to pay for a blood test if he requested one even though he was indigent. Without a State-funded blood test, the alleged father was denied a meaningful opportunity to be heard.

■ *Little* does not support the defendant's argument in this case. Here, the statute provides that the court shall, on request, order the parties to submit to the type of test that it deems appropriate "to determine inherited characteristics, including, but not limited to, blood types and genetic markers such as those found by Human Leucocyte Antigen (HLA) tests." (Ill. Rev. Stat. 1989, ch. 40, pars. 2511(a), (b).) An indigent party is not required to pay for a blood test. (Ill. Rev. Stat. 1989, ch. 40, par. 2511(g).) Unlike *Little*, a blood test was ordered in this case which was paid for by the State's Attorney and the Department of Public Aid. Although the court ordered a type IV blood test, that type of test was not being performed at the time due to budget constraints. However, neither the statute nor *Little* requires a type IV test and the test performed here complied with the statute's requirements. The defendant had the opportunity, although he did not take advantage of it because he was indigent, to have other genetic systems tested independent of court order. (Ill. Rev. Stat. 1989, ch. 40, par. 2511(i).) Contrary to the defendant's arguments, Boonlayangoor's testimony established that the test performed, which

was between a type III and IV, was accurate and reliable. As a result, the defendant was not denied a meaningful opportunity to be heard.

▪ █ The defendant claims that he was also denied due process based on an alleged conflict of interest on the part of the Department of Public Aid, the State's Attorney, and Boonlayangoor. He contends that they would benefit from a verdict favorable to the plaintiff. The defendant does not cite any cases that directly support his position; he relies solely on *In re Murchison* (1955), 349 U.S. 133, 99 L. Ed. 942, 75 S. Ct. 623, where the Supreme Court stated that it is a basic requirement of due process to have a fair trial in a fair tribunal and that our system of law attempts to prevent the probability of unfairness. In this case, neither the Department of Public Aid nor the State's Attorney had any control over how the blood test was performed. As to whether Boonlayangoor's testimony was skewed in favor of the reliability of the blood test because he set up the program at the hospital, it was the jury's responsibility to determine whether he was biased. Based on its verdict, it found he was credible. There was no probability of unfairness and the defendant was not denied due process.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.