[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this action for dissolution of marriage, the Plaintiff husband claims that one minor child, presently seven years of age, was born to the Defendant wife during the marriage but alleges that the child is not issue of the marriage. His prayers for relief include a request for a finding that he is not the father of the child. The Defendant's answer denies Plaintiff's allegation of non-paternity and, by cross complaint, Defendant alleges that the minor child is issue of the marriage and seeks,inter alia, an order of support for the child. The Court has appointed counsel for the minor child in recognition of his CT Page 896 obvious interest in the outcome of the issue.
The Plaintiff has moved the Court for an order of genetic/blood testing to determine the issue of paternity. The Defendant and counsel for the minor child, without conceding that Plaintiff is not the child's father, oppose genetic testing. They correctly claim that C.G.S. § 46b-168(a), the statute authorizing genetic testing when paternity is in issue, vests the trial court with discretion to allow or deny such testing. They argue that the Court should deny genetic testing in this case, claiming that Plaintiff, irrespective of the actual paternity of the child, is estopped by his past conduct from now claiming that he is not the child's father.
The Court conducted an evidentiary hearing on the motion on September 10, 1997, subsequent to which briefs were filed on behalf of the Plaintiff and Defendant on September 19, 1997, and on behalf of the minor child on September 26, 1997. The Court finds the following facts. The parties were married in 1987. At the time, the Defendant had a daughter (from another relationship) who was then three years of age and with whom the Plaintiff developed and enjoyed a close relationship. The parties subsequently encountered problems in their relationship and separated in January or early February of 1990, with Plaintiff (then in the Navy) relocating to his next duty station in Virginia and Defendant moving in with her parents in Panama City, Florida, approximately one month thereafter. The testimony of the parties significantly diverges at this point on the issue of their access to each other. Plaintiff claims that he next saw the Defendant in August and, at that time, she was visibly pregnant and acknowledged that he was not the father of her then unborn child.[1] Defendant admits that she was intimate with another man in March of 1990. She testified, however, that she went to Virginia in April at Plaintiff's request and she claims it was their intimacy during this visit that resulted in her becoming pregnant. She claims that she informed the Plaintiff of the pregnancy in May and that he was happy upon hearing this news. Notwithstanding Defendant's version of the facts, the parties did not reconcile at this time.
The child was born on January 8, 1991 in a military hospital in Florida. The Plaintiff claims that he was present at the time of the child's birth at the Defendant's request and felt this was appropriate because, notwithstanding the circumstances, she was still his wife and he cared about her. Plaintiff acknowledges CT Page 897 that his name was put on the child's birth certificate, however he denies having been consulted in this regard. Defendant, on the other hand, claims that she advised Plaintiff of her intention to give the child Plaintiff's last name and that Plaintiff never objected.[2]
The parties were residing separate and apart from each other at the time of the child's birth. This continued for approximately five months thereafter, at which time the parties attempted a reconciliation. Again, the parties' testimony diverges on their respective understanding regarding the child and the issue of reconciliation. Plaintiff claims he told the Defendant on many occasions that, so long as they were together, he would treat the child in the same manner as he had treated Defendant's daughter, however he would not undertake any responsibility for the child in the event they separated again. He urged the Defendant, without success, to pursue the child's father and get him involved. Defendant, on the other hand, claims that she reconciled with the Plaintiff on the basis of his promise that he would always take care of her and the child. The parties' reconciliation in the summer of 1991 was followed by subsequent lengthy periods when they were apart. These periods of separation include February of 1992 to October of 1992 (when the Plaintiff was on military deployment), from February 1995 until the summer of 1995 and from February of 1996 until the present time. Hence, although the child is presently seven years of age, Plaintiff and Defendant have lived apart approximately three and a half of those years.
The Plaintiff had an ongoing relationship with the minor child until December of 1996. When the parties lived together, the Plaintiff treated the child much like a father would treat a son. The child's daycare provider as well as his kindergarten teacher testified that they had met Plaintiff on a number of occasions and understood him to be the child's father.[3] Even during periods of separation (until December of 1996), the Plaintiff maintained an interest in the child. This was manifested in a variety of ways such as having the child stay over with him at times, taking him to daycare or school, meeting with his teachers and remaining apprised of his academic progress, and contributing to his needs. Plaintiff acknowledges that he and the child feel something for each other. The Defendant acknowledges that Plaintiff has been good to both of the children. Defendant requested that Plaintiff not tell the child that he wasn't his father and, as a result, the child has CT Page 898 always called the Plaintiff "Daddy" and, until this hearing, believed Plaintiff to be his father.[4] It was only after the Defendant commenced a support action against the Plaintiff that he stopped seeing the child.[5]
"In Connecticut, there is a presumption that a child born during lawful wedlock is the child of the husband, which presumption may be rebutted only by clear, convincing and satisfactory proof that the child is illegitimate. "Schaffer v.Schaffer, 187 Conn. 224, 226 (1982). In this case, the Plaintiff testified that he and the Defendant were not together at the time of conception and, in support of that contention, he now seeks genetic testing as further evidence that he is not the father of the child. Our statutes permit such testing for this intended purpose. C.G.S. § 46b-168. Case law attests to the significance of such evidence. Holland v. Holland, 188 Conn. 354,363 (1982) (describing blood test evidence as "highly probative"); Little v. Streater, 452 U.S. 1, 7, 101 S.Ct. 2202,2206-2207 (1981) (noting the absence of controversy regarding the reliability of blood testing in the quest for truth in paternity matters).
And yet, a decision attributing paternity is no less weighty than one terminating parental rights. Holland, supra, at p. 363. The duty to support a child is one which falls, pursuant to statute, upon the parents of the child. C.G.S. § 46b-84. The Plaintiff contends that he is not the father of the child in this case and, therefore, he should not be liable for his support. Clearly, if the Plaintiff is to advance this legal position, the time to do so is now.[6] The Defendant, on the other hand, argues that it is already too late for Plaintiff to claim that he is not the father of the child. She opposes genetic testing because, in her view, the Plaintiff should be estopped by his past conduct from claiming that he is not the parent of the child.
Principles of estoppel can apply in matters of this nature. In Remkiewicz v. Remkiewicz, 180 Conn. 114 (1980), the Court, though rejecting the claim for lack of necessary supporting facts, clearly accepted the concept that, under certain circumstances, one could be estopped from denying paternity.Remkiewicz, at p. 119. See also Judson v. Judson, 15 CONN. L. RPTR. 191 (1995) (J. Gill); Perkins v. Perkins, 34 Conn. Sup. 187
(1977). In Remkiewicz, the Court found that CT Page 899
 (T)here are two essential elements to an estoppel: the party must do or say something which is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief; and the other party, influenced thereby, must actually change his position or do something to his injury which he otherwise would not have done. Estoppel rests on the misleading conduct of one party to the prejudice of the other. In the absence of prejudice, estoppel does not exist. (Citations omitted).
Remkiewicz, at p. 119. In a different context, the Court has further observed that
 (E)quitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, . . . as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse. (Citations omitted).
Emerick v. Emerick, 28 Conn. App. 794, 802 (1992).
Our appellate courts have not addressed the appropriate focus in determining the "prejudice" element of estoppel in this context. Nor is there a consensus amongst the courts of sister states. Although no jurisdictions absolutely preclude estoppel under any circumstances, two opposing views appear to have emerged.
The first line of cases approach the issue from a financial perspective, i.e. whether any financial detriment has been suffered as a result of the actions or representations of the husband. The second line of cases focuses, instead, on the emotional impact on the child on learning that the man he or she thinks of as a father is denying paternity. In K.B. v. D.B.,639 N.E.2d 725 (Mass.App.Ct. 1994) a case involving facts strikingly similar to those present here, the Court concluded, on the basis of an extensive survey of relevant case law, that the line of cases focusing on financial detriment represented the majority view on the issue. A similarly extensive survey of the case law is found in Pietros, 638 A.2d 545 (R.I. 1994). CT Page 900
In the event that this Court applies the financial detriment approach, the facts do not support a finding of estoppel. This Court agrees with the observation made in K.B. v. D.B., supra, that the element of detriment is difficult to establish "because it is rarely found that the husband's past provision of financial support has worsened the wife's and child's claim on other sources of support, including the biological father." K.B., at p. 729. This is not a case in which Defendant can claim that she was misled into bearing or keeping a child based upon the representations of the Plaintiff. See e.g. Perkins v. Perkins,34 Conn. Sup. 187 (1977). Nor is this a case in which Defendant was misled by Plaintiff into not pursuing another man who might have been the father of the child. The Plaintiff urged the Defendant, without success, to get the child's actual father involved in the matter.[7] He told Defendant he would help with the child, financially and otherwise (as he had with Defendant's daughter), only for so long as he and the Defendant were together. In the absence of any conduct or representations which caused the Defendant to forego otherwise existing sources of support, the Plaintiff's involvement clearly enhanced, rather than impaired, the child's financial well being.
Hence, a claim of estoppel in this case can prevail only if this Court chooses as its focus the issue of emotional, rather than financial, detriment to the child. Certainly, there is a natural desire not to render any child illegitimate and, consequently, there is a natural inclination to impose paternity upon the Plaintiff by estoppel if, in fact, he is not the child's biological father. The Plaintiff's relationship with the child is qualitatively much the same as one would expect between a father and a son. The Plaintiff is the only father figure the child has ever known. Because he had never been told differently (at Defendant's request), the child believed the Plaintiff to be his father and called him "Daddy". Irrespective of whether he affirmatively held himself out as the child's father, the Plaintiff's conduct certainly induced a perception in others that such a relationship existed. The Plaintiff himself acknowledges that he and the child feel "something" for each other; this Court has no doubt that this "something" is that unique love which exists between the father and son. By the Defendant's own account, the Plaintiff has always been good to the child.
And yet it seems, in other respects, inequitable under the circumstances to impose upon the Plaintiff (if he is not the CT Page 901 biological father) the permanent and substantial financial burden of supporting the child. Clearly, if the Defendant conceived this child with another man, the Plaintiff found himself in an awkward position. He had a pre-existing marital relationship with the Defendant which, if perpetuated, would have to do so with the child as a member of the family unit. The Plaintiff believed he had two alternatives under the circumstances. One alternative, which would have eliminated any successful claim of estoppel, was to openly and continuously disavow the child while continuing his relationship with the Defendant. The Plaintiff believed this alternative to be demeaning and humiliating to the Defendant. The second alternative was to make clear to the Defendant from the outset the extent of the commitment he was prepared to undertake with respect to the child (that he would support and help out with the child so long as he and the Defendant were together). The Plaintiff opted for the latter and it appears from the evidence that he fulfilled that commitment. As indicated previously, there is little question that the Plaintiff's financial contributions benefitted [benefited] the Defendant and the child. Likewise, it is the Court's belief that the child benefitted [benefited] from the care and love which he received from the Plaintiff even though, at this point, he undoubtedly suffers from the loss of that relationship. Nothing in the evidence suggests that the fatherly love and guidance provided by the Plaintiff was available or would have been forthcoming from any other source.
The issue in this case really goes to the "desirability of encouraging husbands in this situation . . . to assume voluntarily support of children without the fear that doing so may obligate them permanently." K.B. v. D.B., at p. 729. This Court believes that such conduct should be encouraged and concludes that a finding of estoppel would discourage, rather than encourage, individuals such as the Plaintiff from getting involved. As the Court stated in In Re Marriage of A.J.N v.J.M.N., 414 N.W.2d 68 (Wis.App. 1987), at p. 71:
 Voluntary support of nonmarital children . . . should not be discouraged. Therefore, while it is difficult to understand the husband's decision to abandon the child, use of estoppel to impose a support obligation on a non-biological parent must be applied cautiously. If the law imposes a permanent duty on persons who undertake to support a child they did not parent, they may choose to avoid supporting the child to CT Page 902 not find themselves permanently obligated. Additionally, we should not apply the equitable estoppel doctrine to force a support obligation upon a nonparent because the husband developed a close relationship with the child and nurtured [sic] them into a family unit while "acting" as the natural parent. This type of family relationship should be encouraged rather than discouraged through the possible consequence of becoming permanently financially obligated for child support.
Similarly, the Court in Knill, 510 A.2d 546 (Md. 1986) observed, at p. 552, that:
 [The husband] knew that [the child] was not his son and, nevertheless, treated him as his son and as a member of the Knill family. Such conduct is consistent with this state's public policy of strengthening the family, the basic unit of civilized society. We encourage spouses to undertake, where feasible, the support, guidance and rearing of their spouse's children, so long as such conduct does not deprive the children of their right to support from their natural parents. . . We believe [the husband] should not be penalized for his conduct.
Indeed, the Court questions whether the "emotional impact" basis for finding estoppel ultimately serves the best interest of children in these situations.[8] In this case as well as certain others found by the Court; see e.g. Pietros v. Pietros,supra; the party against whom the support obligation was sought disassociated himself from the child at or about the time support proceedings were commenced. The disassociation (which the Court believes was strategically motivated to avoid inferences which might otherwise be drawn in determining the issue of estoppel) had the effect of terminating not only the voluntary support that had previously been provided but, more importantly, the relationship with the child as well.
It is this Court's experience and belief that the love of a child is priceless. Consequently, it is difficult to comprehend Plaintiff's decision that he and this child not be part of each other's lives.[9] Nevertheless, based upon the facts found and CT Page 903 legal principles enunciated herein, the Court concludes that Plaintiff should not be estopped from denying paternity in these proceedings[10] and, accordingly, the motion for genetic testing is granted. The Plaintiff shall bear the cost of such testing.
Solomon, J.