PRESENT: All the Justices

JACK HARVEY

OPINION BY
JUSTICE STEPHEN R. McCULLOUGH
June 27, 2019

v. Record No. 180015

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF COLONIAL HEIGHTS
Steven C. McCallum, Judge


JOHN WESLEY THOMAS, II,

v. Record No. 180764

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
David B. Carson, Judge

The respondents, both previously adjudicated to be sexually violent predators, were committed to the Department of Behavioral Health and Developmental Services after a trial court determined they had violated the terms of their conditional release. They argue that, because they are indigent, the Due Process Clause requires the State to appoint a psychological expert to assist them in a hearing. The purpose of the hearing is to determine whether the respondents violated the conditions of their release and whether these violations render them unsuitable for conditional release. Hearings must occur on an expedited basis and a respondent will subsequently be re-evaluated, upon request, within six months of his recommitment or sooner depending on the scheduling of the annual review. We conclude that, in this specific context, given the temporary, expedited nature of the hearing and the other protections afforded to the respondents, including the right to counsel, the Due Process Clause does not require the State to appoint an expert.

BACKGROUND

JACK HARVEY

Harvey was convicted of sexual battery in 1983. In 1995, he was convicted of indecent liberties and solicitation to commit sodomy. According to the pre-sentence report, Harvey sexually molested three young boys over a period of several months. The boys were 8 to 14 years old. One of the victims reported that Harvey engaged in oral sex with him every other weekend, placing a pillow over his mouth and threatening to shoot him in the brain if he told anyone. The second victim testified that Harvey would lock him in a room and participate in "sex games" with him. The third boy testified that Harvey would take his clothes off but he resisted. This boy reported that he was not molested as much as the other boys because he was older.

Harvey was adjudicated to be a sexually violent predator ("SVP") in 2011 and committed for secure treatment to the Virginia Center for Behavioral Rehabilitation ("VCBR"). After several years of treatment at VCBR, he was granted conditional release in November 2014. One of the conditions of his release was that he "will follow the Probation and Parole Officer's instructions and will be truthful, cooperative, and report as instructed." He was also instructed to "not frequent places where children congregate."

On March 11, 2016, Harvey was the subject of an emergency custody order for violating the terms of his conditional release. His probation officer reported that:

> On 8/4/15, Harvey admitted to using [a] phone service
> "MegaMate" to solicit other males for oral sex. Reported meeting
> up and exchanging oral sex with 2 different men. Harvey is
> instructed to not use any form of social networks and that he must
> disclose his sex offender/SVP status which he reported that he did
> not do. He was instructed not to use this service. On 3/9/16,
> Harvey admitted to calling [the phone service] 2-3 times since as
> well as using another similar service at least 3 times. He admitted

2

to attempting to solicit the exchange of oral sex, however, due to technical difficulties with the system he was not able to set up these meetings. He further admitted had he been successful in meeting these men, he did not plan to advise them he is a sex offender.

Three days later, Harvey's probation officer submitted a "Major Violation Report" detailing Harvey's failure to abide by certain conditions of his release, notably failing to follow the instructions of his probation officer and frequenting a place where children congregate.

On April 28, 2016, Dr. Glenn Rex Miller, a licensed clinical psychologist, issued a ten-page report. In preparing his report, Dr. Miller reviewed court records, treatment notes, and interviewed Harvey. Among other things, Dr. Miller detailed Harvey's poor response to community supervision and his disregard of his probation officer's instructions. The report concluded that Harvey did not meet the criteria for conditional release, and that outpatient supervision and treatment "do not appear appropriate at this time." Dr. Miller concluded that Harvey "needs treatment in a secure environment to prevent his condition from deteriorating."

Harvey filed a motion for the appointment of an expert, arguing that the Due Process Clause required the state to provide him with a defense expert. The circuit court denied the motion.[1] Following a hearing that included testimony from his probation officer, the circuit court concluded that Harvey had violated the conditions of his release and that he was "no longer suitable for conditional release." The circuit court revoked his conditional release and committed him to the custody of the Department of Behavioral Health and Developmental Services (the "Department").[2]

---

[1] Judge Edward A. Robbins, Jr. entered an order to this effect on August 29, 2016.

[2] Judge Steven C. McCallum entered this order on October 4, 2017.

J OHN W ESLEY T HOMAS, II

Among other things, Thomas was convicted of carnal knowledge of a 13-year-old girl.

He was also convicted of breaking and entering and sexual battery. While incarcerated, he

received four institutional infractions for inappropriate sexual behaviors, including exposing

himself while masturbating.

Thomas was adjudicated as an SVP in 2012. He was granted conditional release status in

May 2015. Thomas was required to comply with numerous detailed and onerous conditions in

order to be placed on conditional release:

> **II. Supervision:** Persons placed on conditional release will be supervised
> by the DOC Office of Community Corrections, probation and parole. As
> such, Mr. Thomas, having been found a sexually violent predator, will be
> subject to the following DOC conditions.
> - Standard DOC conditions of supervision as a sex offender.
> - Mr. Thomas shall abide by the laws of the Commonwealth of
>   Virginia; conditions of his probation/parole and be of good
>   behavior; he will follow all probation/parole/supervising officers'
>   instructions and will be truthful, cooperative and report as
>   instructed once released from parole/probation.
> - Warrantless searches of person, vehicle, computers, or real
>   property by law enforcement officers based on "reasonable
>   suspicion."
> - Will register as a sex offender in Virginia and or the state of
>   residence.
> - Have no contact with his victims or their families, either directly or
>   by third party, without the permission of his supervising officer.
> - Participation in and successful completion of any sexual offender
>   assessment, treatment, technological monitoring to include GPS or
>   other electronic methods, and polygraphs for treatment use as
>   directed by the DBHDS Office of SVP Services and the
>   supervising probation and parole officer.
> - Report to his assigned supervising officer on the day he is released
>   from custody.
> - Be seen in person by his supervising officer or designee at least
>   once per week for at least six months from his release date. After
>   his six month review, the number of contacts may be reduced with
>   the approval of OSVP Services.
> - Receive a minimum of one home visit per month from his
>   supervising officer or designee.

4

- Maintain a landline phone for the purpose of GPS supervision if required by his supervising officer.
- Payment for any fees related to these services is the responsibility of the individual. The Commonwealth may or may not be able to provide some financial support for treatment.
- Have no unsupervised contact with minors, defined as persons physically or mentally younger than 18 years old, unless by prior approval of his supervising officer, the OSVP, and the court.
- Keep a log of incidental contact with any minors to be surrendered to his supervising officer and polygrapher upon request; he will answer polygraph questions about the accuracy of his entries.

\* \* \*

At a minimum, any home plan should meet the following minimum conditions.

(1) Mr. Thomas will reside at the address approved by his supervising officer, any moves will be approved by his supervising officer, who will immediately notify the office of SVP and OAG of the changes.

(2) He shall live in a home in which no minors are residents, overnight visitors, or are left under his supervision for any period of time.

(3) He shall not view or possess any sexually explicit or suggestive materials, either print, photo, or electronic in any format.
- He shall not establish nor visit any electronic networking sites.
- He shall not access pornographic or otherwise sexually explicit sites.
- He shall, upon instruction from his supervising officer, submit any and all electronic devices with data storage capability, including but not limited to; computers, cell phones, mp3 devices, cameras and gaming systems to his supervising officer for forensic examination.
- Mr. Thomas will have privileges to use a computer for job search, work, or applying for disability, banking, etc.

\* \* \*

**Treatment needs:**

*Sex offender treatment:* To assist Mr. Thomas in maintaining abstinence from sexual aggression, if granted SVP conditional release he will:

(1) Mr. Thomas will participate fully with all requirements of sex offender treatment including attending all scheduled appointments and successful completion of the program, with a practitioner or

group practice certified by Virginia as a Sex Offender Treatment Provider. He shall sign a release giving his supervising officer full permission to communicate with the practitioner or group practice providing this treatment.

(2) Mr. Thomas will be responsible for the costs of his treatment and medications.

(3) He shall neither use nor possess any item which his supervising officer and/or sex offender treatment provider determines to be counter-therapeutic or possibly related to offending behaviors.

(4) He shall comply with any recommended assessments including but not limited to a penile plethysmograph and/or visual reaction time testing.

(5) He shall sign a release giving his supervising officer full permission to communicate with the practitioner or group practice providing this treatment.

*Substance abuse treatment*

(1) He shall abstain completely from using or consuming any and all illegal controlled substances and alcohol.

(2) Mr. Thomas shall receive any and all prescribed psychoactive medications through one physician and one pharmacist. His supervising officer will have access to this individual or group.

(3) Mr. Thomas will participate in laboratory assessment for non-approved substances in accordance with instructions from his assigned supervising officer. He shall sign a release giving his supervising officer full permission to communicate with the person or agency administering this testing.

(4) Mr. Thomas shall enter into, actively participate in, and successfully complete a substance abuse evaluation and treatment with a practitioner or group practice certified by Virginia. He shall sign a release giving his supervising officer full permission to communicate with the practitioner or group practice providing this treatment.

(5) Mr. Thomas will participate in AA meetings, attending his first meeting within 24 hours of release. He will attend a minimum of 2 meetings per week for the first six months. Once he has completed six months of meetings he will attend a minimum of 3 meetings

per month until his supervising officer determines that these meetings are no longer necessary. He shall sign a release giving his supervising officer full permission to verify his attendance.

*Mental health treatment:* Mr. Thomas has a history of anxiety and stress; he was prescribed Vistaril, a mild anxiolytic to help him sleep. He will be referred to a local psychiatrist to follow him and prescribe medications if deemed necessary.

*Regular examination:* To prevent his use of illegal or other controlled substances that can disinhibit him to sexually abusing, and to encourage him to recognize and fully disclose any and all sexually abusive or victim-focused "grooming" behaviors:

(1) He shall complete a clinical polygraph on questions prepared by his treatment provider in coordination with his supervising officer six months after being placed on conditional release and thereafter at the request of his treatment provider, supervising officer or the Department. He shall sign a release giving his treatment provider and supervising officer full permission to communicate with the person or agency administering this testing, with reports forwarded to his treatment provider, supervising officer and the Department.

*Employment:* To reduce his free unsupervised time Mr. Thomas will seek viable employment and/or appropriate leisure time activities. Mr. Thomas is pursuing social security benefits. If employed his attendance will be verified on a regular basis and any changes will be reported immediately to his supervising officer. Prior to beginning or engaging in new activates he will consult with his supervising officer.

*Social support network:* The conviction that made him SVP-eligible was for sexual aggression towards an adolescent and an adult female. To protect family, friends, and associates from his aggressive tendencies:

(1) Mr. Thomas will receive approval from his supervising officer to attend functions where minor children will be or where his risk factors would be escalated. Mr. Thomas will also avoid functions where alcohol or drugs or other criminal activities are present, (Restaurants and family approved functions are excluded).

In June of 2016, Thomas was subject to an emergency custody order after he was arrested for driving while intoxicated. Dr. Miller conducted an SVP Conditional Release Evaluation. He concluded in his report that, despite "a number of issues that are of concern," Thomas may

remain an appropriate candidate for conditional release. In August of 2016, the Commonwealth and Thomas agreed to amend his conditional release plan and release him under this modified plan.

Following another violation of the terms of Thomas' conditional release, Dr. Miller issued a second report in which he opined that Thomas was not appropriate for conditional release. On March 30, 2017, the court again found that Thomas had violated the conditions of his release. In April 2017, over the objections of the Commonwealth, the court again ordered Thomas released, provided he first completed a substance abuse program. In August 2017, after he completed this program, the court ordered Thomas conditionally released.

In October 2017, after he submitted a urine screen that tested positive for cocaine, Thomas was, for the third time, the subject of an emergency custody order for violating his conditional release plan. Thomas, invoking the Due Process Clause, filed a motion asking for the court to appoint Dr. Craig S. King to act as his psychological expert. The court denied the motion for a psychologist, but granted the motion allowing him $1,000 to secure a toxicologist. The court ultimately concluded that Thomas had violated the conditions of his release and that his conditional release should be revoked. Accordingly, the court committed him to the custody of the Department.

ANALYSIS

I. THE DUE PROCESS CLAUSE DOES NOT REQUIRE THE APPOINTMENT OF A DEFENSE EXPERT IN EXPEDITED HEARINGS TO DETERMINE WHETHER AN SVP VIOLATED THE CONDITIONS OF HIS RELEASE AND SHOULD CONTINUE ON CONDITIONAL RELEASE.

Both Harvey and Thomas argue that, because they are indigent and cannot afford to hire an expert, the Due Process Clause requires the government to provide them with an expert to assist them in a hearing, the purpose of which is to determine whether they violated the

8

conditions of their release and whether they are no longer suitable for conditional release. Code § 37.2-913(D).[3]

The Fourteenth Amendment of the United States Constitution provides that a state cannot "deprive any person of life, liberty, or property, without due process of law." "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 162 (1951) (Frankfurter, J., concurring). Rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The core of due process is notice and the opportunity to be heard before an impartial tribunal. *See, e.g.*, *Pappas v. Virginia State Bar*, 271 Va. 580, 587 (2006). In some circumstances, however, due process requires more. For example, an indigent criminal defendant facing incarceration is entitled to court appointed counsel. *Gideon v. Wainwright*, 372 U.S. 335 (1963); *Argersinger v. Hamlin*, 407 U.S. 25 (1972).

In *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976), the Court articulated a three-factor framework to determine the scope of due process protections:

> (1) the private interest that will be affected by the official action;
> (2) the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and (3) the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail.

---

[3] Thomas perplexingly argues that we should apply the demanding "strict scrutiny" standard in interpreting the statute and hold that the statute is "facially invalid" if we do not interpret it to offer a respondent a psychological expert. He did not raise these arguments at trial. Under Rule 5:25, we generally will not consider an argument raised for the first time on appeal. This rule of procedural default applies to constitutional claims. *Townsend v. Commonwealth*, 270 Va. 325, 332 (2005). Although Rule 5:25 permits the Court to exercise the discretion to consider arguments raised for the first time on appeal "to enable [it] to attain the ends of justice," we see no reason to apply the ends of justice exception in this case and, therefore, we do not address the argument.

*See also Ake v. Oklahoma*, 470 U.S. 68, 77-80 (1985) (applying the *Mathews* three-factor framework).

Harvey and Thomas analogize their case to *Ake v. Oklahoma*. In *Ake*, a capital murder case, an indigent defendant asked the court to provide him with a psychiatrist for the purposes of making an insanity defense. *Id.* at 72. He also requested the services of an expert to oppose the prosecution's expert on the question of "future dangerousness," one of the factors relevant to a death sentence. *Id.* at 72-73.

Upon reviewing the three factors, on the question of an expert to assist the defendant in mounting an insanity defense, the Court held that

> when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.

*Id.* at 83. On the question of an expert to address "future dangerousness," the Court held that a defendant is entitled to expert assistance to present an alternative viewpoint. *Id.* at 84.

*Ake*, of course, was a criminal prosecution, where a defendant is presumed innocent and where constitutional protections reach their apex. Harvey and Thomas are not defendants in a criminal case. They are adjudicated SVPs who were released subject to certain conditions. The Supreme Court has noted that "a civil commitment proceeding can in no sense be equated to a criminal prosecution." *Addington v. Texas*, 441 U.S. 418, 428 (1979). The fact that a respondent in a proceeding under Code § 37.2-913 is provided "some of the safeguards applicable in

10

criminal trials cannot itself turn these proceedings into criminal prosecutions requiring the full panoply of rights applicable there." *Allen v. Illinois*, 478 U.S. 364, 372 (1986).

Harvey and Thomas were provided with, among other due process protections, notice and the opportunity to be heard as well as court appointed counsel. The question before us is whether due process also requires the government to provide them with expert assistance. Applying the three-part framework above, we conclude that the Due Process Clause does not require the Commonwealth to provide an expert for a hearing under Code § 37.2-913.

A.    An SVP respondent possesses a recognized, yet diminished, liberty interest.

Turning to the first factor under *Mathews*, there is no question that Harvey and Thomas have a liberty interest at stake. *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980); *Addington*, 441 U.S. at 425. Even in civil commitment proceedings, "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).

The liberty interest in this case, however, differs materially from the liberty interest at stake in a criminal case. A defendant in a criminal case faces the prospect of a potentially lengthy term of incarceration or even, as in *Ake*, capital punishment. The potential deprivation of liberty in a hearing under Code § 37.2-913 is not a fixed term of incarceration or death, but a revocation of conditional release and short-term civil commitment. Even when an SVP is committed, the commitment only lasts until the next hearing or annual review. *See* Code § 37.2-913(D) (allowing an SVP to petition for re-release no sooner than six months from his return to custody); Code § 37.2-910 (providing for annual review). At their annual review, if they request discharge, Harvey and Thomas are entitled to be evaluated by a second expert. Code § 37.2-910(B).

11

Further contrasting a civil commitment under the SVP statute with a criminal prosecution, a defendant in a criminal case is presumed innocent. *See Coffin v. United States*, 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."). In contrast, Thomas and Harvey have already been found, by clear and convincing evidence, to be "sexually violent predators." Code § 37.2-908. A "sexually violent predator" is

> any person who (i) has been convicted of a sexually violent offense, or has been charged with a sexually violent offense and is unrestorably incompetent to stand trial pursuant to § 19.2-169.3; and (ii) because of a mental abnormality or personality disorder, finds it difficult to control his predatory behavior, which makes him likely to engage in sexually violent acts.

Code § 37.2-900. Although they were conditionally released, their release subjected them to onerous terms of release, noted above. These terms of release limit an SVP's liberty, and thus diminish the liberty interest at issue in Code § 37.2-913 proceedings.

We also make note in this context of a countervailing interest. A respondent facing a civil commitment, or recommitment to a secure facility, has an interest in receiving restorative treatment. A respondent also benefits from not harming, or threatening to harm, third parties, which could in turn lead to prosecution and incarceration as well as acts of self-defense or reprisal by victims or their families.

We recognize the respondents' liberty interest in avoiding commitment to a secure facility, but there is no question that an SVP's liberty interest is a diminished one when compared to the liberty interests under review in capital cases, like *Ake*, and other criminal proceedings.

12

B. The State's interest weighs against the appointment of an expert.

The next factor in the *Mathews* framework is an evaluation of "the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail." *Mathews*, 424 U.S. at 321. The cost of providing an expert, of course, is involved, but more is at stake. We must also examine the administrative burdens that the procedure would entail.

The Commonwealth's interest in a proceeding under Code § 37.2-913 is protection of the public from individuals who have already been adjudicated as SVPs. The General Assembly plainly contemplated expedited proceedings when an SVP has allegedly violated the conditions of his release. The statutory framework calls for an "emergency custody order" to take a respondent into custody "immediately." Code § 37.2-913(B). Thereafter, an expert must "as soon as practicable, perform a mental health examination of the respondent." Code § 37.2-913(B). After the expert submits a report, "the hearing shall be given priority on the court's docket." Code § 37.2-913(C). Entitling an SVP respondent to his own expert would significantly alter this dynamic. Continuances to locate and produce an expert will cause delay where resolution of a matter is intended to be both expeditious and temporary.

Hearings under Code § 37.2-913(B) are more akin to bail hearings or to a civil emergency custody order under Code § 37.2-808, under which a magistrate acts on an expedited basis to determine whether a person should be placed into temporary custody based, in part, on "the recommendations of any treating or examining physician or psychologist licensed in Virginia." That initial decision will then be revisited at a future date. We are aware of no authority extending *Ake* to situations like bail hearings or routine emergency civil commitment

13

proceedings.  We conclude that the State's fiscal and administrative burden does not favor an extension of *Ake* to situations like this one.

>  C.  The risk of an erroneous deprivation of liberty through the procedures used is minimal, and the probable value, if any, of additional procedural safeguards is slight.

The final factor to consider is the "the risk of an erroneous deprivation of [the private] interest through the procedures used, and probable value, if any, of additional procedural safeguards." *Mathews*, 424 U.S. at 321.  The procedure under Code § 37.2-913 differs from the insanity plea or the challenge to future dangerousness that were at issue in *Ake*.  In a criminal case, the Commonwealth will seek out an expert for the purpose of presenting evidence favorable to the prosecution's theory.  Under Virginia's SVP framework, however, the Department designates an expert "skilled in the diagnosis and risk assessment of sex offenders." Code § 37.2-913(B).  Significantly, the Attorney General's Office, the entity responsible for handling SVP cases, does not select the expert.  The expert appointed by the Department must "perform a mental health examination of the respondent, including a personal interview," Code § 37.2-913(B), and, considering the statutory criteria, "opine whether the respondent remains suitable for conditional release." *Id.*  The expert is not the prosecution's expert or the defense's expert.  That expert may conclude, over the objections of the Attorney General, that the respondent is, in fact, amenable to conditional release.  For example, in Thomas's case, after Thomas violated the terms of his conditional release, the expert initially concluded that Thomas could continue on conditional release.  There is no reason to believe that the experts employed by the Department will not give an honest and unprejudiced assessment of a respondent's suitability for conditional release.  This non-adversarial model for selecting experts reduces the risk of an erroneous deprivation of a liberty interest.

14

Unlike the defendant in *Ake*, who was required to shoulder the burden of proving the affirmative defense of insanity, the Commonwealth bears the burden in a hearing under Code § 37.2-913 of proving "that the respondent . . . has violated the conditions of his release and that the violation of conditions was sufficient to render him no longer suitable for conditional release." This allocation of the burden of proof further reduces the need for a separate expert for the respondent.

Furthermore, the respondent is entitled to other protections. Pursuant to Code § 37.2-901, a respondent in any SVP hearing, including a hearing to determine whether the SVP should be conditionally released following a violation, is entitled to the following rights:

1. To receive adequate notice of the proceeding.
2. To be represented by counsel.
3. To remain silent or to testify.
4. To be present during the hearing or trial.
5. To present evidence and to cross-examine witnesses.
6. To view and copy all petitions and reports in the court file.

At the hearing, court-appointed counsel can challenge the factual basis for the revocation and can challenge the expert's conclusions. These due process protections further mitigate against the risk of an erroneous deprivation of liberty.

Finally, the risk of error is significantly mitigated by subsequent reviews. Unlike a defendant in a criminal case, who faces a fixed term of incarceration subject to limited challenge on appeal or on collateral review, an SVP respondent has the opportunity to revisit his commitment. An SVP can petition for re-release no sooner than six months from his return to custody, Code § 37.2-913(D), or earlier if the date of his annual review is less than six months. Code § 37.2-910. At their annual review, if they request discharge, Harvey and Thomas are entitled to be evaluated by a second expert. Code § 37.2-910(B). In Thomas's case, the Court

15

appointed Dr. King for Thomas's annual review hearing.  Dr. King is the same expert Thomas

sought in the hearing held under Code § 37.2-913(D).

Applying the *Mathews* framework to this specific context, we conclude that the Due

Process Clause does not require the State to provide an SVP with an expert.  The SVP possesses

a recognized but diminished liberty interest.  The expert who issues the report is not selected by

the entity responsible for prosecuting SVP cases but rather by the Department.  The SVP is

afforded other due process protections, such as the right to counsel.  The outcome of the hearing

will determine whether the SVP should be recommitted or remains suitable for conditional

release.  The SVP, however, can petition for re-release within six months or sooner, depending

on the date of the petitioner's annual review.  These circumstances, in combination, lead to the

conclusion that the Due Process Clause does not require the appointment of an expert for a

hearing under Code § 37.2-913.

D.      *Little v. Streater* does not compel a different outcome.

Harvey and Thomas point to *Little v. Streater*, 452 U.S. 1 (1981), in support of their

argument that the Due Process Clause requires the court to provide them with an expert in a

hearing under Code § 37.2-913.  That case offers them no support.  In *Little*, the Supreme Court

held that due process required the state to pay for a blood test to establish paternity when the

putative father cannot afford one.  *Id.* at 16.  Parenthood, once established, carries with it a

number of weighty obligations, including the obligation to financially support a child.  The fact

that due process requires the state to provide a simple and relatively inexpensive test that can

conclusively answer the question of paternity for an indigent person sheds little light on what due

process protections are due in entirely different contexts.

16

II.     THE TRIAL COURT PROPERLY CONSIDERED THE EXPERT'S REPORT.

Finally, Harvey argues that the expert's report should not have been admitted into evidence without a live witness to authenticate the report. He asserts that "there is nothing in the SVP statute to suggest that, because the evaluator's report is part of the record, its contents are admissible as evidence." We disagree. Under Code § 37.2-913(B), once the expert has conducted an evaluation of the SVP, "[t]he evaluator shall report his findings and conclusions in writing to the Department, the Office of the Attorney General, counsel for the respondent, and the court in which the petition was filed. The evaluator's report shall become part of the record in the case." The General Assembly did not order the report to "become part of the record in the case" simply to adorn or thicken the file for no purpose. It ordered the report to be part of the record in the case so the court could consider it in determining whether to return the SVP to conditional release or order that he remain in the custody of the Department. This reading is confirmed by Code § 37.2-913(D), which provides that

> The evaluator designated in subsection B may be permitted to testify at the hearing as to his diagnosis, his opinion as to whether the respondent remains suitable for conditional release, his recommendation as to treatment and supervision, and the basis for his opinions.

If the expert were functionally required to testify in every case, that passage would be entirely superfluous.

It is true that the General Assembly did not craft an express exception in this statute to the general rule excluding hearsay. Nevertheless, the most logical interpretation of Code §§ 37.2-913(B) and (D) is that the General Assembly intended for the report of the expert to be admissible and for it to be considered by the trial court. With respect to presentence reports, Code § 19.2-299 contains similar language, mandating that such reports "shall be filed as a part

17

of the record in the case."  Presence reports are routinely considered in criminal cases.

Therefore, we conclude that the trial courts did not err in considering the expert's report.

CONCLUSION

The decisions below will be affirmed.

*Affirmed*.


JUSTICE MIMS, with whom JUSTICE GOODWYN and JUSTICE POWELL join, concurring in part and dissenting in part.

I concur with the majority that the circuit court properly considered the expert's report in Harvey's proceeding.  However, I must write separately because I disagree with the majority's conclusion that the Due Process Clause does not require the appointment of a mental health expert on behalf of a sexually violent predator ("SVP") in any proceeding to revoke his or her conditional release.

The fundamental criterion in determining whether to revoke the conditional release of an SVP is "whether the [SVP] remains suitable for conditional release."  Code § 37.2-913(B).  In other words, the decision turns not on the mere fact that an SVP has violated the terms of conditional release but "on the *meaning* of the fact[,] which must be interpreted by expert psychiatrists and psychologists."  *Addington v. Texas*, 441 U.S. 418, 429 (1979) (emphasis in original).  That is because—unlike revoking probation or a suspended sentence under Code § 19.2-306, for example—the commitment of an SVP to inpatient treatment is neither punitive nor retributive.  *See Kansas v. Hendricks*, 521 U.S. 346, 361-62 (1997) (noting that the absence of punitive, retributive, and deterrent motives are essential to upholding a state's statutory SVP civil commitment scheme from constitutional attack on double jeopardy or ex post facto grounds); *see also* Senate Doc. No. 30, Virginia State Crime Commission, Report on the Civil

18

Commitment of Violent Sexual Offenders at 6-7 (1999) (stressing the necessity that Virginia's then-pending statutory SVP commitment scheme comply with this requirement).

That does not mean that the fact or the nature of the violation are irrelevant. The fact that the SVP has violated the terms of conditional release is a mandatory element for which there must be probable cause before an emergency custody order may be issued. Code § 37.2-913(A). The circuit court may not revoke conditional release without finding that the terms were indeed violated. Code § 37.2-913(D). However, the decision to revoke conditional release must be based not on the fact that the SVP violated the terms of release, but whether the violation is a symptom of a relapse in the SVP's mental health requiring that he or she be recommitted for inpatient treatment. The nature of the violation is relevant to that inquiry, as reflected in at least three of the statutory criteria the court may consider when answering it: the SVP's response to therapy or treatment; his or her present mental condition; and his or her response to treatment while on conditional release. Code § 37.2-912(A)(iv)-(vi). But the fact of the violation is simply one of several indicators that inpatient treatment is again necessary, *because of the then-current state of the SVP's mental health*.

Having thus established that the outcome of a conditional release revocation proceeding depends on a mental health expert's evaluation of the SVP, I am not persuaded that *Ake v. Oklahoma*, 470 U.S. 68 (1985), is so readily distinguishable as the majority holds. In *Ake*, the Supreme Court of the United States recognized that mental health may be determinative in cases where it is in question and the role mental health experts play in evaluating it is critical:

> when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense. In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's

19

mental condition, and about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question. They know the probative questions to ask of the opposing party's psychiatrists, and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the elusive and often deceptive symptoms of insanity and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

Psychiatry is not, however, an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis to be attached to given behavior and symptoms, on cure and treatment, and on likelihood of future dangerousness. Perhaps because there often is no single, accurate psychiatric conclusion on legal insanity in a given case, juries remain the primary factfinders on this issue, and they must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party. When jurors make this determination about issues that inevitably are complex and foreign, the testimony of psychiatrists can be crucial and a virtual necessity if an insanity plea is to have any chance of success. By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them. It is for this reason that States rely on psychiatrists as examiners, consultants, and witnesses, and that private individuals do as well, when they can afford to do so. In so saying, we neither approve nor disapprove the widespread reliance on psychiatrists, but instead recognize the unfairness of a contrary holding in light of the evolving practice.

The foregoing leads inexorably to the conclusion that, without the assistance of a psychiatrist to conduct a professional examination on issues relevant to the defense, to help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses, the risk of an inaccurate resolution of sanity issues is extremely high. With such assistance, the defendant is fairly able to present at least enough information to the jury, in a meaningful manner, as to permit it to make a sensible determination.

*Id.* at 80-82 (internal citation quotation marks, and footnotes omitted).*

---

* Although the Court noted that "[a] defendant's mental condition is not necessarily at issue in every criminal proceeding" and required "an ex parte threshold showing to the trial court

The majority discounts *Ake*'s relevance here, noting that it was a criminal case where the defendant was presumed innocent until convicted, but SVPs have already had their classification adjudicated. That is true, but it is important to emphasize that the question of whether an SVP must be committed or recommitted for inpatient treatment does not—and cannot—flow from his or her criminal conviction, but from the civil proceeding that led to the classification. In that respect, adjudicated SVPs on conditional release are similar to anyone who has been determined to be in need of involuntary admission under Code § 37.2-814 and later discharged under Code §§ 37.2-837 or -838: the only question to be decided is whether there has been a relapse in their mental health from the improvement that justified their release from inpatient treatment. There are three reasons why *Ake* should apply in this context.

First, Code § 37.2-901 affords SVPs the right to counsel and the right to present evidence and cross-examine witnesses in a conditional release revocation proceeding. *Ake* explains why mental health experts are critical for both purposes. An attorney's legal training and experience does not qualify him or her, without more, to evaluate a client's mental health. Only mental health experts may (1) "analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition;" (2) "offer opinions about how the [SVP's] mental condition might have affected his behavior at the time in question;" and (3) "organiz[e] a[n] SVP's] mental history, examination results and behavior, and other information, interpret[] it in light of their expertise, and then lay[] out their investigative and analytic process to the" fact-finder. *Ake*, 470 U.S. at 80-81.

---

that his sanity is likely to be a significant factor" before he accrues the right to an appointed mental health expert, an SVP's mental condition is at issue in a conditional release revocation proceeding, so, as with a criminal defendant who has met the threshold, "the need for the assistance of a psychiatrist is readily apparent." *Ake*, 470 U.S. at 82-83 (italics omitted).

Similarly, an attorney's legal training and experience alone are no guarantee that he or she will be able (1) to understand the Commonwealth's mental health examiner's report or "translate a medical diagnosis," (2) to "know the probative questions to ask of the opposing party's psychiatrists" "to conduct a professional examination on issues relevant to the defense" or "prepar[e] cross-examination," or (3) "to interpret [the Commonwealth's expert's] answers." *Id.* at 80-82. Thus, the appointment of a mental health expert is essentially an extension of the right to counsel. *See id.* at 83 ("[T]he State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and *assist in evaluation, preparation, and presentation of the defense*.") (emphasis added).

Although the majority stresses that the Commonwealth's expert is independent—"not the prosecution's expert or the defense's expert," *ante* at 14—because he or she is designated by the Department of Behavioral Health and Development Services, rather than the Office of the Attorney General, that fact does not support its holding in my view. An independent expert cannot satisfy the role *Ake* requires because his or her independence limits what the SVP's counsel may discuss, thereby diminishing the utility of having an expert to assist the SVP in the first place.

In *Turner v. Thiel*, 262 Va. 597, 599-600 (2001), we considered a relevant scenario in the context of reviewing a trial court's refusal to disqualify a witness who had been designated as a defense expert after he had reviewed a medical malpractice plaintiff's records and discussed treatment and care with the plaintiff's counsel, with a focus on the questions of negligence and proximate causation. The expert declined to serve as the plaintiff's expert and was subsequently designated by the defendant.

22

On appeal, we reversed the trial court's judgment. We held that the questions to determine whether to disqualify an expert witness for a conflict of interest were (1) whether it was objectively reasonable for the first party to conclude that a confidential relationship existed between the party and the expert, and (2) whether the party disclosed any privileged or confidential information to the expert. *Id.* at 601. In assessing what information was privileged or confidential, we decided that it included "a party's strategy in litigation, the kinds of experts that the retaining party expected to employ, a party's views of the strengths and weaknesses of each side's case, the role of each of the litigant's expert witnesses to be hired, anticipated defenses, counsel's theory of the case, and counsel's mental impressions." *Id.* at 603.

Obviously, if the mental health expert designated by the Commonwealth for the conditional release revocation proceeding is not the SVP's expert, even if he or she is independent, the SVP's counsel cannot objectively reasonably conclude that a confidential relationship exists between the two of them. Consequently, counsel cannot pose the questions or solicit the information necessary to fulfill the purpose of the expert required in *Ake*, because doing so would reveal confidential information.

Second, a non-indigent SVP would, under Code § 37.2-901, have the right to retain a mental health expert both (1) to assist counsel with formulating litigation strategy, identifying defenses, and assessing the strength and weaknesses of the Commonwealth's expert's report and testimony; and (2) to cross-examine the Commonwealth's expert and adduce alternative evidence to rebut his or her credibility or evaluation. In *Ake*, the Court recognized the right to a court-appointed expert expressly because failure to do so would result in unconstitutionally disparate treatment that disadvantaged the indigent criminal defendant solely because of his or her relative poverty. *Ake*, 470 U.S. at 81-82 & 82 n.8 (noting "the unfairness of a contrary

23

holding"). The same disparity would exist here between proceedings to determine the confinement of an indigent SVP versus a non-indigent one.

Third, while the liberty interest implicated by commitment to inpatient treatment is certainly different from the interest implicated by incarceration, it is not entitled to less weight for *Ake* purposes. To the contrary, in *Vitek v. Jones*, 445 U.S. 480, 489, 493 (1980), the Supreme Court acknowledged that transferring an inmate between prisons does not infringe a liberty interest when it is within the discretion of corrections officers, but a transfer from a prison to a mental health facility does. *Id.* at 493-94. This is not to say that being committed is worse than being imprisoned, but the consequences of involuntary commitment "are qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.* at 493. "A criminal conviction and sentence of imprisonment extinguish an individual's right to freedom from confinement for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections." *Id.* at 493-94.

Viewed in this light, my analysis of the three factors from *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976) differs from the majority's. First, the private interest affected by revocation of conditional release is significant. Although the SVP has previously been adjudicated to be an SVP, he or she has also been found to be suitable for conditional release because, in part, he or she "does not need secure inpatient treatment." Code § 37.2-912(A)(i). The SVP therefore is in the same position as immediately after having been adjudicated to be an SVP under Code § 37.2-908(C), but before the court initially determined whether he or she needed to be committed for inpatient treatment under Code § 37.2-908(D), or whether alternative treatment options were adequate under Code § 37.2-908(E).

24

Code § 37.2-907(A) entitles an indigent SVP to a court-appointed expert in a Code § 37.2-908(C) proceeding, so, by the time of the Code §§ 37.2-908(D) and (E) inquiry, the SVP's counsel has had the benefit of that expert's assistance in interpreting the Commonwealth's expert's report, preparing a defense, and cross-examination. Any evidence adduced from the SVP's court-appointed expert is also in the record for the court's consideration when it decides whether inpatient treatment is necessary. Thus, the statutory scheme recognizes and addresses the *Ake* concerns about the uniqueness of mental health experts for the initial treatment decision, and it must also do so at later stages when the issue arises again.

Second, the Commonwealth's countervailing interest is minimal. The Supreme Court in *Ake* determined that the financial burden of providing a single mental health expert is insubstantial, and it was "difficult to identify any interest of the State, other than that in its economy." *Id.* at 78-79. Although the majority succeeds where *Ake* failed by identifying an additional, administrative burden, that, too, is insubstantial. Although *Ake* requires that the SVP have access to a mental health expert who may provide confidential assistance to counsel, the Supreme Court expressly stated that this right does not include a "right to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Id.* The due process concern is that the SVP have an expert in whom counsel may confide to obtain objective assistance. The time it takes to identify and appoint such an expert, and to allow him or her to collect the necessary information to discharge the function envisioned in *Ake*, should not be substantially longer than the time it takes the Commonwealth's expert.

Third, the risk of error if the SVP does not have an expert is not slight, and the value of the added procedural safeguard of appointing one is not minimal. As *Ake* illustrates, depriving the SVP of a mental health expert impairs the right to counsel. Although the independence of the

25

Commonwealth's expert may insulate the proceeding from bias, independence is no guarantee that the professionally-uncritiqued evidence adduced from a single expert will be untainted by oversight or mistake, and counsel cannot reliably identify such oversight or mistake, if it exists, without the aid of an expert.

For these reasons, I conclude that the Due Process Clause may require the appointment of a mental health expert on behalf of an SVP in a conditional release revocation proceeding. I therefore respectfully dissent.